The Judges
delivered their opinions.*
*20 Judge Coalter.
On the facts as they are in proof, I consider it as most clear and apparent, that if the case had been before the Court of Law, as it is now before us, the appellants would have had a judgment for their debt.
The agent of the appellants had put into the hands of their attorney, a bond to bring suit on, and which he knew to be justly due from the intestate of the appellee. He had no knowledge of the existence of the fact out of which the defence grew; nor had he the least suspicion that such fact existed, or cause to suspect that such defence could or would be relied on, otherwise he could have met and defeated it. He was not only kept ignorant thereof, but lulled into security, (whether intentionally or not, it is not material to decide,) by the acts and declarations, as well of Hancock, in his life-time, as of his administrator after his death. The defence, therefore, was a complete surprise on him.
If Hancock himself had made this defence, it would not only have , been a surprise, but a palpable fraud; and if intentional fraud cannot be brought hóme to the appellee, Tyler, his administrator, yet the effect of the defence by him is the same, upon the appellants, as if it had been made fay his intestate; and there is no more reason, that I can see, to protect his estate from the consequences of such defence in the hands of his administrator, than in his own hands. But, even the administrator, Tyler, is not altogether clear of blame in the premises. f
But, moreover, this claim originated in trust and confidence. That trust was, at least, so far abused by Hancock in his life-time, as that papers were left by him, out of which this unjust defence grew; and thus, in effect, a breach of that trust and confidence has arisen; which furnishes, it seems to me, a distinct head of equity in this case.
The facts establishing these positions are as ¿fallows: Oswald, JDeniston fy Co. residents of Great Britain, had *21 several stores in this country, prior to the Revolution. They appointed Laird as their general agent, to wind up their affairs after the Revolution, and to collect and secure their debts, Sic. It was necessary for him to have a sub-agent or. collector of the concerns growing out of two of the stores; and, on the recommendation of one Muschett, he appointed Hancock, a relation of Muschett, (and concerned with him at that time or afterwards, in mercantile transactions,) to that trust; Muschett becoming responsible for his transactions therein. In consequence of this responsibility, Muschett took a mortgage on some slaves of Hancock, for his security, which was recorded. Hancock went on collecting. &e. until about the beginning of the year 1803; when, becoming intemperate, he could no longer be confided in, and a change of agency became necessary. A correspondence took place between Laird, Muschett and Hancock, on this subject; and it was ultimately agreed that Muschett should succeed to the agency, on the same terms that Hancock held it> and the books and papers were accordingly delivered over to him. It seems, however, that Muschett still anticipated employing Hancock in the business, as far as he should deem it safe to do so. Muschett accordingly proceeded with the agency. In May, 1804, a settlement took place of Hancock’s agency, between him and Murdock, the clerk of Laird; and- in April, 1805, he and Muschett gave their bond for 399i. 2 6, the balance due, after correcting some small errors in the previous settlement, with interest from the 16th of May, 1804. This bond was delivered to Laird, and remained in his possession until it was delivered to the attorney to bring suit on. It was no part of the concerns which Muschett had an agency in; on the contrary, he was a co-obligor, and, as to the appellants, as much a principal in the bond as Hancock; though, as between them, he was security only. It of course was never put into his hands for collection; nor could it have been supposed that he would be employed as agent to collect a debt due from himself.
*22 This being the known and undoubted state of the ease, Muschett and Hancock, who had been in trade together, make a settlement of their accounts in September or October, 1805; in which, Muschett falling in debt to Hancock, he charges himself with the whole amount of the said bond of 3991. 2 6;- although, on the day of its date, he had paid 971. 18 ICb, part thereof, being commissions then due on his collections, and of course, as between them, took upon himself the payment of the balance of the debt.
This being the situation as between those parties, and Muschett now having his indemnity in his own hands, he gives Hancock a release of the mortgage on the slaves, which is proved and recorded on the 21st of October, 1805. This shews that the settlement was before that date, and as the interest between them is calculated up to the 1st of September, 1805, I conclude that it took place'about the latter date. This release contains, on its face, a statement which was probably understood, on the trial at law, to be an acknowledgment by Muschett, the agent, that the collections by Hancock were fully paid off; whereas, in fact, it could only have had reference to the settlement of the accounts aforesaid; as it is no where pretended that the debt was ever paid by Hancock, otherwise than by Muschett charging himself there with it, as aforesaid.
On the 16th of December, Í805, and of course after this settlement, Hancock writes to Laird, and instead of informing him of that settlement, and that Muschett had thus, in fact, (if it was so considered,) collected that debt, he tells him he is going to Dumfries on the 26th, to make a final settlement, of all mercantile transactions, with Muschett and his sons; and asks to be furnished with a statement of interest arising on the settlement made in 1804, and also the amount of interest on the settlement in April, 1805; and also with a copy of the bond.. This shews, conclusively, that he knew Muschett had not this document in his possession. On the 21st December, Laird answers his letter, and informs him that the bond granted by him *23 and Muse • it on the 2d of April, 1805, was for 39!)/. 2 6, bearing interest from the 16th of May, 1804. Interest to the 2d of April, 1805, is 21/. 1 6Ü; which makes the whole due on that d«v, 420/. 4 0£; when a payment was made by Muschett of Oil. 18 10|; leaving a balance due Osiuald, Deniston Co. “ by you and Muschett," of 322/ 5 2, with interest. He then goes on to remind him how this debt originated, and to press him for payment.
From this time, until the death of Hancock, he was repeatedly pressed for payment, and as often promised it, as is in proof, by Laird, and Murdock his clerk, and never once pretended or stated that he had paid it to Muschett, though he alledged that Muschett was in his debt. He well knew that the settlement between him and Muschett, was no payment; and it is the most charitable view that can be taken of his conduct, to say, that probably he forbore mentioning that settlement to Laird, not wishing his partner and friend to be pressed for the money. In fact, however, it is charged in the bill, and I do not understand it to be denied in the answer, that Muschett was at that time insolvent; though that state of his affairs was then only known to his partner Hancock. If this was the fact, there was a fraudulent intention in making this settlement and concealing it, if it was intended thereby to throw the loss on the appellees. The answer, after insisting on the power of Muschett and Hancock to make the settlement so as to discharge Hancock, admits the insolvency of Musphett, and says that that is the reason why .the appellants now seek to charge Hancock's estate, &c.
Tyler, his administrator, was also pressed for payment, and invariably promised it, even down to- within a few months before the suit, when he wrote a letter, proposing arrangements for the payment; and never before that refused payment; nor even after the suit, was this payment, as it is called, to Muschett, ever intimated to Laird, although, in his answer, he states that he had for a long time intended to insist on this ground of defence. It is true, he also states, that he made it known to the clerk of Laird, *24 and that both he and his counsel knew the claim would be contested. But, so far from proving any such notice, the is proved; and the fact is, that Laird had no intimat ion or suspicion, nor had his attorney, (as is proved by them both,) of this defence, until after it was made. In short, the attorney did not believe that any serious defence was intended.
It is true, that a motion was made for a continuance, at one time, in which some transaction wdth Muschett is mentioned; but no explanation is given; and the attorney for Tyler says it would have been refused, if asked for. As Muschett was a co-obligor, and had made the only payments that were made (for he made another payment besides that above mentioned,) the agent, if he had known of this motion, might well have supposed that some further discount was claimed as a payment by Muschett, or that something was supposed to be due to him or Hancock, as agent, which ought to be credited; the principal credits given, being payments in that way; and the agent knowing that nothing of this kind could be shewn, he would not have deemed it necessary to attend the trial. It does not appear, however, that he knew of that motion.
The agent, in his deposition, proves that he had no suspicion of any such defence, and that he believed the letter of Hancock, requesting a statement, was merely to enable him and Muschett to settle their accounts; that payment never had been refused, either by Hancock or Tyler ; but that the latter, as late as May 21st, 1810, (shortly before the suit,) had, by letter, promised payment. This letter is in the record. The clerk of Laird also proves frequent applications to Hancock, who never alleged a payment to Muschett. The Judge who tried the cause, also proves, that the evidence satisfied his mind of the correctness of the verdict; and there was nothing to induce the plaintiff’s attorney to suffer a non-suit.
The surprise caused by this unjust and groundless defence, is therefore clearly proved.
*25 • The answer, though it states as aforesaid, that he told the clerk of Laird the nature of this defence, yet admits that it was only a few days before the trial, that he had found the settlement above referred to, and which evidently formed the chief ground of defence, though, he says, he had long before abundant proof of that settlement. Wherein that proof consisted, he does not state; and it is not pretended, that he gave notice after finding the settlement. In short, he proves no notice whatever; but the reverse is clearly proved, both by the agent, and the attornies on both sides.
The intestate Hancock, had received the monies of the appellants, as their agent and collector; had failed to pay, and never has paid, the monies so collected; and they must lose this just debt, in consequence of a surprise in setting up an unjust and groundless defence, unless equity can relieve.
But it is said, this must be the result, because the attorney for the appellants failed to suffer a non-suit. It may be worthy of remark, as farther excuse for him, that the defendant had wished for a continuance at the trial Court, in order to make his defence yet stronger; and he might have supposed it safer for his clients to take the chance of a trial on the then evidence, (which the Judge proves was altogether circumstantial,) than to suffer a non-suit. But be this as it may, shall a mistake of an attorney, in this respect, arising from his total ignorance of the real facts of the ease, subject a party to the loss of his debt, where a surprise, if not a fraud, is clearly proved ? In other words, is there no case in which a plaintiff at law can excuse himself for not suffering a non-suit ? The attorney for the appellants states, in his deposition, that he did believe after the trial, that Muschett had a right to collect this debt, and that Hancock had made a proper payment: that ho was entirely ignorant of the manner in which it originated, &c. and believed that there could be no chance thereafter to resist the evidence, and therefore he did not *26 suffer a non-suit, as he otherwise would have done. He denies that he moved for a new trial, as stated in the answer, as there was no ground for such motion:
Suppose a defendant to a suit on a bond, gives notice that he intends to rely on certain set-offs, but in a subsequent conversation with the plaintiff, who satisfies him that he can repel those set-offs, he agrees not to insist, on them, but still makes the defence; and the attorney, not knowing of these facts, (his clients, as in this case, not being present,) fails to suffer a non-suit. Must the plaintiff lose his debt? This fraud could have been guarded against, by suffering a non-suit, as well as the surprise in this case. Surely, I think, equity would relieve against such fraud. The objection, then, if I am right in this, is not universal and inflexible. It must depend on the nature of the case that is made out.
This Court has uniformly, and in many cases, gone farther in extending their equitable relief, beyond what would be sanctioned by British decisions; on the reasonable and proper ground arising out of the nature of our Judicial jurisprudence, the dispersed situations of clients and attornies, and the uncertainty when suits can be tried, &e. But I think, such a case as that above put, and indeed this very case, would be relieved against in England.
In Richards v. Symes, 2 Atk. 319, an issue had been directed out of Chancery, to ascertain whether the mortgage in question was given to the defendant. Of course, he was plaintiff in the issue. On the trial, the defendant in that issue, in order to discredit one Bere, the most material witness for the plaintiff in the issue, produced a person to swear that this witness was not in England, at the time he swore to the fact. Several affidavits were read, on the motion for a new trial, to prove that Bere was in •England, when he ^wore to the fact; and it was insisted, that the'credit of Bere being invalidated, as aforesaid, weighed greatly with the jury, and was the principal reason that induced the verdict, and that the plaintiff was only *27 prepared to support his general character; otherwise he could have given the same answer he is now prepared to do, had he been aware of the objection. The Lord Chancellor says, this application comes after a long time, &c. The ground for a new trial is surprise, &c. A great many objections have been made to the motion, and amongst others, that this is an application for a new trial, after a verdict, found by a special jury, upon a trial at bar. He agrees that formerly some countenance was shewn to this objection, and a distinction taken between í-Aj!s at bar, and at Nisi Prius; because the latter are subordinate to the former, and therefore not of so solemn a iliture. iRut this objection 'has been over-ruled, &c. m ,
But the main ground on which he ,d9) is, that :v. vras proved that notice was given to the ■ a fortnight before the trial, that they' would, on t ápther side, af tempt to prove Bere abroad, which, the^J^it was not so" particular as to point out the very place »re they would; shew him to be, was sufficient notice for plaintiff to prepare to eiH.u'i-'ifsr this evidence. Another reason which weighed (though that does not appear to have been insisted on l.tv the counsel) was, that the new trial is asked by the p'ial.Uiff at law; and if it had been better made out, he would not have inclined to grant it, because it was in his power to have been non-suited; for, if his counsel had been of opinion that there was evidence, of which they were not apprised, and too strong then to encounter, he might have advised him to suffer a .¡cn-suit, and then he might have come back for new directions, &c- The Lord Chancellor, however, does not pretend to sdy> that no neto trial can be granted, where the partt might suffer a non-suit. But, the execution of th-e martgage to the defendant, the plaintiff in this issue, was the very po<nt in dispute, and Bere was the principal witness; so that if he had not been notified that he would no discredited, and had been surprised in that-respect, he could not fail to see the propriety of a non-suit. He was present too, to aid his counsel. *28 Moreover, he had notice, and a fair opportunity to meet the evidence. I can see no more danger in relieving a in a case of surprise properly made out, than to relieve a defendant in such case.
But, suppose the agent of the plaintiffs had been informed of the verdict, in time to apply for a new trial at law, and had made out the case that now appears before us. Would he have been correctly told, that although he knew of no defence, much less of that which was set up, that hh should have attended from Court to Court, in order to aid his counsel IrA th's suit on a plain bond, the payment of which had nev er beet'fefused, but always promised; andjaecause he did, not do Ms, although completely surprised by the evidence and dtSfcge set up, the verdict must stand, though manifestly again justice ? And would not this decision have been the meT^^traordinary, if the Judge had certified, a?3 he has pror this cause, that there was nothing in thee case to admmsl the counsel of the propriety and necessity of suffi'n ? a non-suit ? I should rather be disposed to think, ■.hat had a non-suit been entered,-and the whole-, matter had appeared to the Court afterwards, and before tibe end oi the Term, the non-suit even ought to have been set aside, and a new trial granted, instead of putting t'ne part}' to begin de novo. I think I have seen such practice in the oil District Courts.
In Bright, executor of Crisp v. Eynon, 1 Burr. 390, an action was brought on a note for the payment of money. The defence set up was a discharge by the testatrix under her hand, as it was alleged, though the body of the paper was written by the defendant. Ke called two witnesses, who said they believed th; name subscribed to be her hand; but their knowledge of it v,as slig;ht; one of them having only seen her sign a receipt T!ne question on the trial was, whether it was forged «r not? There were various circumstances proved on both slues; and though that fact is not stated, they serve to shew, that the nature of the defence was known to the plaintiff. The two witnesses, how* *29 ever, who believed it to be her hand, were not opposed by any witnesses to the contrary, and the reason given was, that the plaintiff had no opportunity of getting it inspected. Two questions were left to the jury; first, whether it was forged? secondly, whether it was not obtained by fraud, and without her knowing the contents, and effect of the discharger The plaintiff took his chance with the jury, who found a verdict for the defendant, and then moved for a new trial. Lord Mansfield says, “ Trials by jury could not subsist now, without a power somewhere to grant new trials. A general verdict can only be set right by a new trial, which is no more than having the cause more deliberately considered by another jury, when there is reasonable doubt, or perhaps certainty, that justice has not been done.” In our case that certainty exists.
He enumerates several causes for setting aside verdicts, and amongst others, “that the parties may be surprised by a case falsely made at the trial, which they had no reason to expect, and therefore, could not come prepared to answer.” He does not confine such case of surprise to the defendant alone. The parties may be surprised; and the very case was a motion by the plaintiff for a new trial, who might have suffered a non-suit, so as to have taken time to inspect the paper. He goes on to say, “that for a good while, the granting of new trials was holden to a degree of strictness so intolerable, that it drove the parties into a Court of Equity, to have, in effect, a new trial at law, of a mere legal question, because the verdict, in justice, under all the circumstances, ought not to be conclusive, and many bills have been entertained on this ground, and the question tried over again at law, under the direction of a Court of Equity; and therefore, of late years, the Courts of Law have gone more liberally into..the granting of new trials, according to the circumstances of the respective cases.” He goes on then to consider the case. “If the matter in dispute was of great value,” (it was only 60/. there, but from one to two thousand dollars here,) “I will *30 not say that all the suspicious circumstances might not be a ground for a new trial, to give the plaintiff an opportunity of getting the instrument inspected, by persons acquainted with her hand; though, I think, upon the evidence laid before the jury, the verdict, in that respect, was right. What I go on, is, the apparent fraud &ic. in obtaining the discharge, if she really signed it.” He then goes into the circumstances in proof on both sides, and finally says: “ The attention of the jury was artfully drawn to the heinous nature of the charge of forgery only; and I left the question of fraud to them, without any express direction, that the circumstances spoke fraud apparent. The same jury might, on re-consideration, find a different verdict.” On the whole, he was for granting a new trial, in which the other Judges concurred.
If Lord Mansfield would have been right in granting a new trial, even as to the point of forgery in this case, had it been a matter of great value, in order that the plaintiff, who was present, and might have suffered a non-suit, might come better prepared; surely in this case, where he was not present, where he proves, that a false case was made (innocently or not by the administrator, makes no difference,) which he had no reason to expect, and therefore could not come prepared to answer, he ought to have had a new trial at law, had he come in before the adjournment, and made out his case there. Shall it be said that he would have been repelled there, because he did not attend the trial, though being apprised of the event, he came in during the Term ? I hope not. If he would have been excused at law, and obtained a new trial there, (as I cannot doubt that he would,) whence comes it, that a Court of Equity will be more rigid and less inclined to protect a party against surprise and the most manifest injustice, than a Court of Law would and ought to be? Courts of Law had formerly held parties to intolerable strictness, (says Lord Mansfield,) in consequence of which, equity interfered. They, however, afterwards pursued equity in this *31 respect. Are they now to take the lead, and is equity even not to go as far as they would and ought to go?
The excuse is as good for not appearing during the Term, as at the trial; and if Equity will not relieve when a of Law would, it must be for reasons, of which I am not able at present to appreciate the weight. Doubtless, should that be the decision of this Court, it will be right. But, until better advised, my opinion is, that even in England, where their judicial system is such as to guard against surprise and accidents of this kind, infinitely more than we can, a new trial would be granted in this case, either at law or equity; at law, if the ease could have been presented there; or in equity, if the party, without culpable neglect, (as is shewn in this case,) could apply no where else. We, necessarily, in my humble opinion, go farther than in England, in granting equitable relief against judgments at law. It would be no difficult matter, to shew this to have been the uniform course of this Court, from .the earliest reports of its decisions, to the present' day. The decisions have not been entirely uniform, I admit; sometimes more liberal of relief, and again less so. But, the uniform course repeatedly declared by our ablest and most experienced Judges, as necessarily arising out of our jurisprudence, and the nature of our territory &e. has been to enlarge the equitable jurisdiction. - I admit that it ought not to be too latitudinous; and the latter decisions seem to me to be more properly guarded than the earlier.
I am not disposed to depart too hastily from those landmarks; and at all events, if I have at all succeeded in shewing that this would be relieved against in England, or even to raise a great doubt, whether it would or would not, I will be borne out by the great eurrent of our own decisions, in granting relief here. Why is it that we see a great pressure in this State to get, into Courts of Equity, in all cases requiring considerable investigation and patience of enquiry, but because of the circumstances aforesaid, so often recognised by this Court? I think, therefore, *32 it holds a fortiori here, that the inestimable trial by jury will cease to be the favourite tribunal in civil causes, unless it is supported both by Courts of Law and Equity, by a liberal hand in granting new trials, as heretofore has been the practice. Who will quietly sit down under the loss of thousands of dollars, because he has not attended from year to year, and at great expense, the progress of a suit on a bond, the payment of which had never been denied, in order to see whether some gun-powder plot may not blow him up at the trial, and defeat his just claim, unless his attorney suffers a non-suit; when that attorney, an able counsellor in this Court, and the enlightened Judge before whom this cause'was tried, concurred in the opinion, that the safest and most proper course was, to submit the case to the jury, on the circumstantial evidence that was before them ? Mankind ought not to be driven by the course of judicial proceedings, to such misanthropic suspicions of their fellow-men; and I think the argument by the counsel of the appellants, was very strong to prove, that no man should be bound to entertain such suspicions. Why that feeling in the country, evincing the necessity of interposition by Courts of Equity, which produced the late Acts of Assembly, giving this Court appellate jurisdiction, in cases of refusals of injunctions, even in the country, and appeals from their dissolution ? Mankind will not sit down under the enormous injustice, presented by this and similar cases. They will call for arbitration laws, or some other means of escape from it.
In these general views of sound policy, I think myself supported by the great current of authorities in this Court, down to the present day, and which it would be too tedious now to pass in review.
There is one case, however, in this Court; Tarpley's adm’r. v. Dobyns, 1 Wash. 185. There the bill alleged that the dealings were in specie; and on a settlement in 1779, a bond was given for 54i. current money: that after-wards, a payment of 61. 10, was made in specie/ and that *33 the defendant still acknowledged himself further indebted, which could not have been, if the debt had been subject to the scale of ten for one: that the plaintiff brought suit; and not suspecting that the defendant would contend that the debt should be scaled, he was unprepared to prove the defendant’s declarations, tending to sheio that he considered it as a specie debt. The bill was demurred to. The demurrer was sustained by the County Court, and that decree affirmed in the High Court of Chancery. The President delivered the opinion of this Court:
“ We feel no difficulty in declaring that both decrees are right. Although the appellant might have resorted to a Court of Equity in the first instance, if his case would bear it, it is now too late, after having made his election to take a trial at law. As to the surprise, which is made the pretext for this application to a Court of Equity, it ought not to benefit him; since, when he discovered a disposition in the appellee to avail himself of his legal advantage at the trial, he might have suffered a non-suit.”
Although, in this case, the bond was given for current money, and not specie, yet I presume, that under that clause of the fifth section of the Act of 1781, commonly called the scale of depreciation, which provides, “ that where other circumstances arise, which, in the opinion of the Court before whom the cause is brought to issue, would render a determination agreeable to the above table unjust, it shall and may be lawful for the Court to award such judgment, as to them shall appear just and equitable,” the party had his remedy at law to recover what was just, on proving those circumstances; or, as would seem to be insinuated by the Court, might originally have come into equity, in order to shew the mistake in giving the bond for current money instead of specie. Yet, having elected his remedy at law, it was decided to be too late to resort to equity. It would seem, too, that in that case, the party was not surprised. *34 The defence at law lay on the. surface of the paper, and when he discovered, (being present, as we must presume from the case,) that the defence was to be made, he proceeded to lake his chance before the jury. The attorney, too, when he brought the suit, must have seen, from the face, of the bond,, that this debt was paid.
In Hawkins v. Depriest, 4 Munf. 469, the failure to suffer a non-suit was expressly insisted on. The bill alledges that the appellee sold to the appellant a quantity of land, containing acres for £ , which he promised to pay: that he executed a deed, and being informed it was necessary to acknowledge the’receipt of the money, he gave a receipt on the back of the conveyance, without having received it: that when he instituted a suit for the money, the defendant, taking advantage of the receipt, prevailed at law, and refuses to pay the money. The bill calls for a discovery of fhe land purchased, the price, and how much has been paid.
The defendant pleaded the judgment in bar; and also answering, admits the purchase, but says he made a full payment, and that the complainant had no legal or equitable claim on him for one cent.
A copy of the record of the suit at law, was produced; which was an action of assumpsit for the price of a tract of land, said to be sold and conveyed for the price of 300i. It appeared, that on the trial, on the plea of non assumpsit, the witnesses proved that the defendant agreed to give to the plaintiff IOOi. for two tracts of land; that this evidence was objected to, as not supporting the declaration; and the Court refused to let it go the jury: to which opinion, there was an exception, but no appeal taken.
Two certibed copies of deeds, both recorded in July, 1791, were filed; shewing, that, the plaintiff in fact sold and conveyed two tracts of land to the defendant for fifty pounds each, on one of which a receipt was endorsed, but none on the other.
*35 Sundry depositions were tafite*? in the Ck&n.cery suit, from which it appeared that no money was paid at the time of writing the receipt, which a subscribing witness considered a mere matter of form: that afterwards, the defendant paid about 521. and claimed credits for some tobacco and corn, and also for. work done; which credits, except the tobacco, being disputed, he determined to stand a suit. The County Court allowed a credit for 61. for tobacco, and decreed the balance of 42/. with interest. This decree" was affirmed by the Superior Court of Chancery in Richmond, and that decree was affirmed in this Court.
In this case, the plaintiff at law had failed, as well from the badness of his declaration, on which, if not the whole, at least some of his evidence, was excluded; and also, because a groundless and unjust defence was set up. He was thus doubly admonished of the propriety of suffering a non-suit. How could he doubt of the propriety of a non-suit in such a ease ? If the evidence was improperly rejected, he could also have appealed. But, after failing to do either of these, he comes at once into equity, to recover his debt thus lost at law. It is there insisted upon, that he should have suffered a non-suit at law; that the merits had been tried there, Sic. . He gets relief, bow.ever, and why ? Because the defendant had set up what he must have known to be a groundless and unjust defence; and the plaintiff is not to be punished by the loss of his debt, because, even with all these circumstances in his case, he failed to suffer a non-suit.
The receipt, in that case, on the deed, was under the usual acknowledgment of livery of seisin, and is in these words: “Received, on the day of the within indenture, of Robert Hawkins, for said land, Tull satisfaction;” and opposite to the signature is a scroll. It does not state that it is sealed. It is evidently a mere formal matter on its face; no sum mentioned, and, I presume, on every ground, was no estoppel at law. The bill is not framed on that ground. The counsel says, it might, perhaps, have been an estoppel. *36 The grounf‘~v. U.o dcck‘.«ft is not stated in the report,* blit, from the arguments sot up on both sides, and the manner in which the failure to suffer a non-suit was relied on, I presume no such ground was seriously insisted on, as giving equity jurisdiction. In fact, he was unprepared to meet the defence. If he had offered the evidence that was before the Court of Chancery, and his other evidence had been received, can any one say he ought not to have prevailed at law? I think not. It could not have been rejected, for the instrument in fact was not sealed.
If that decision is law, surely relief ought to be granted in this case.
Why does a Court of Equity relieve a defendant at law, who has paid part of the debt, and has a receipt, but who fails to make defence and produce it on the trial? Because he was not bound to suspect that the plaintiff had failed, or would be so unjust as to refuse to give him credit; and the immorality and want of conscience, in taking this legal advantage, is too shocking to the moral sense of mankind, to be tolerated in any country, or under any circumstances.
This was probably the ground of the last case. The defendant at law had obtained a receipt, as a matter of form, on the back of the deed, when not one cent of the money had been paid; and it might have been bad law, (though I give no opinion on that point,) if the jury had been instructed, that such receipt, even if under seal, without further proof of payment, was not to be received as evidence of that fact. But, without these efforts at law, lie gets relief here against this fraudulent defence. So here; if the fact be that this debt is unjustly lost, in consequence of a defence, which, if made by Hancock himself, would have been a palpable fraud in fact, and by which he ought not to gain; what more can his administrator say, than that he found the papers out of which the defence grew; that he made it honestly, believing it to be a just defence? But, if it is not so in fact, and if the consequences are the same to the appellants *37 as if he had known the injustice of the defence, how can he, in conscience, claim these unjust consequences? Is it conscientious to do so, if the defence was in fact unjust? He does not stand as an innocent purchaser. He represents the man whose estate justly owes this debt; and who, himself, could not have benefitted that estate, by making this defence.
But, Hancock was a trustee; and if he really intended this settlement with his co-obligor, (an insolvent man, whose circumstances were probably known to him,) to operate as a discharge of himself, and thus to save, out of the wreck, his own debt due from Muschett, it was a fraud; and this in fact, is the amount of the defence. This settlement, having this effect, it is now insisted on, that it was competent for them to make; and if he is to be supposed to intend the consequences of his acts, it was an intended fraud. In such ease of trust and confidence, although more might have been done at law, yet this Court has recognised the principle that .relief is proper in equity, on account of the appropriate jurisdiction of that Court in such cases. Spencer & White v. Wilson, 4 Munf. 130.
In Fenwick v. M’ Murdo, 2 Munf. 244, this Court reviewed many of the leading cases of injunctions, and lay down the general doctrine thus.
The principle, settled on solemn argument, and due consideration of those cases, ought not to be disturbed, which is, “that where a cause has been once fully heard and decided in a Court of Common Law, having competent jurisdiction of the cause, a Court of Equity ought not to interfere, unless fraud, or surprise be suggested and proved, or some material and adventitious circumstance had arisen which could not have been foreseen or guarded against.”
This defence could not be foreseen nor guarded against. The facts, -from which it arose, were altogether in the knowledge of the other party. The only negligence that could he charged on the agent, is, his failure to attend, from Court to Court, a trial of an action on a bond, without knowledge *38 even that it was defended seriously. It had been continued for years, during- the war, on the ground that the defendants were alien enemies; and the letter, a few months be' ^ore the suit, promising payment, was well calculated, to induce a belief that no serious defence was intended. That merely asked some further delay, until some negroes could be sold, which the distributee of Hancock wished to purchase.
On the whole, I am of opinion that the decree ought to be reversed.
Judge Cabell.
The appellants residing in Great Britain, and having many debts due to them in Virginia, contracted at various mercantile establishments, in this State, before the Revolutionary war, employed John Laird as their general agent for the settlement and collection of the said debts. Laird, in the year 1796, appointed Mungo M. Hancock, the intestate of the appellee, as a sub-agent, for the settlement and collection of that portion of the debts aforesaid, that had been contracted at Aquia and Colchester. This appointment was made on the recommendation of James Muschett; who became responsible to Laird for the fidelity of Hancock's agency. In January, 1803, Hancock having become addicted to irregular habits, was dismissed from the agency, and the said Muschett was appointed to succeed him, and to complete the collections which he had begun. More than two years thereafter, viz: on the 2d of April, 1805, a final settlement was had between Laird and Hancock, on account of his collections for Oswald, JDeniston fy Co. and he was found in arrear 399i. 2 6, for which sum he executed his bond to them, with the aforesaid James Muschett as his surety. This bond was never entrusted to Muschett; for, being one of the obligors, it was rather his duty to pay, than his right to receive, the money for which the bond was given. It always remained with Laird *39 or bis clerk Murdock; a fact well known, both to Hancock and to Muschett. When Tyler, the administrator of Hancock, was first applied to. after his qualification, he made no objection to the payment of this bond; but becoming afterwards convinced that the claim was unjust, he determined to stand a suit; which was brought in the Superior Court of Fairfax county. He put in the plea of payment, on which issue was joined. Judge Dade, who instituted the suit, says in his deposition, that he always understood it was a case which was to bo defended on its merits The attorney, however, to whom the cause was afterwards consigned, seems not to have been apprized of that understanding; and although the cause was continued once, if not oftener, at the instance of the defendant, on the ground of the absence of a material witness, he informs us in his deposition, that until the trial of the cause, he considered the plea of payment as “sham plea, and thrown in as a matter of course, and for delay; except so far as to cover some credits, which he knew the defendant was entitled to.” When, therefore, the cause was called for trial, he went into it in full confidence that he wanted no evidence but the bond; and that the defendant had no evidence to resist the judgment he was disposed to demand. On the trial, however, the defendant introduced evidence, which proved that James Muschett (surety in the bond) was a collector for Oswald, Deniston fy Co. under John Laird; and he then introduced a statement, proved to be in the hand writing the said Muschett, purporting to be an account between Hancock and the said Muschett. in which Muschett charges Hancock to John Laird, for the amount of the bond now in controversy. He farther introduced the copy of a release. executed on the 21st of October, 1805, by Muschett to Hancock, of a lien which Muschett had taken from Hancock, in August, 1802, on some slaves, to indemnify him for the responsibility he was under, as surety for Hancock’s faithful discharge of his agency. The consideration of the release, as expressed in the release itself, is, that Hancock *40 had made “a satisfactory settlement with John Laird, agent of Oswald, Deniston £? Co.” There does not appear to have been any other evidence whatever, introduced on trial; nor shall I enquire, whether the evidence was or was not sufficient to defeat the plaintiff’s action. Their attorney seems not to have’doubted its sufficiency; and instead of suffering a non-suit, submitted the case to the jury, who found for the defendant.
The appellants filed their bill in the Court of Chancery for the Fredericksburg district, praying for a new trial of the cause. The bill was dismissed. The appellants appealed to this Court; and the only question is, whether a new trial ought to be granted.
One of the grounds on which the appellants rest their claim for a new trial, is the allegation in the bill, that the settlement of accounts between Muschett and Hancock, and the pretended payment by the latter to the former, of the bond in controversy, was designed as a fraud upon the appellants. This charge is not only unsupported, but is contradicted by the evidence adduced by the appellants themselves. Hancock was the nephew of Muschett; had lived in his family for many years; and appears to have been extensively connected in merchandize with him and his sons. The appellants have produced a letter, written in December, 1805, by Hancock to Laird, informing him that he intended in a few days to go to Dumfries, for the purpose of making a final settlement of all his mercantile and other transactions with James Muschett and his sons, and requesting Laird to send him a copy of the bond in controversy; in which, it will be recollected, that Mus~ chett was his surety. The statement, or account, which the appellants complain of as being fraudulent, is not.dated; but there can be very little doubt, that it was made at the time indicated in this letter. The account embraces individual and mercantile transactions; transactions with James Muschett, (described as James Muschett, sen.) with John M. Muschett, with Charles H. Muschett, with James *41 Muschett, sen. 4" Co. with John M. Muschett 4" Co. and with H M. fy Co. (probably Hancock, Muschett 4' Co.) and it appears that Muschett fell deeply in Hunco elds debt. It will be recollected, that Muschett had then been nearly three years, and was at that time, collector for Laird, as the agent of Oswald, Deniston 4' Co. to whom Hancock’s bond was due; and as it was ascertained that he was thus deeply indebted to Hancock', what could be more natural than that he should undertake, in consideration thereof, to pay to Laird the debt due by Hancock, and for which he was surety; and that, in consequence of such undertaking, he should introduce it in the settlement, and charge Hancock with the bond which he was thus to pay ? Where was the fraud in this? They do not pretend, that this settlément between them amounted to %. payment or discharge of the bond. They both knew they possessed no such power. Hancock took no receipt against the bond, and no evidence even of the settlement. The settlement does not appear to have been entered on either of their books; although, being merchants, they may be presumed to have kept regular books, in which were entered all transactions deemed important. It was found, after Muschett’s death, on a loose^ sheet of paper, without date or signature, pinned to the folio of Muschett’s ledger, in which Hancock’s account was kept From all these circumstances, it would appear, that even as between the parties, it was not intended as an actual settlement, but merely as a statement to shew how the accounts would stand, in case Muschett should, according to his engagement, pay Hancock’s debt to Laird. The release executed by Muschett to Hancock, on the 21st of October, 1805, of the lien on the negroes, which had been given in 1S02, does not vary the aspect of the case in this particular. The lien, it may be observed, was given shortly before Hancock’s irregular habits had caused his removal as agent; before he had had any settlement with Laird, and when the balance due from him on account of his collections, not being ascertained, *42 may have been apprehended to be very large. But when, on the 2d 0f April, 1805, the precise balance due to Laird was ascertained, and when in October of the same year, it became manifest to the parties, that Muschett owed Hancock more money than Muschett was bound for as his surety, to Lair'd, it would have been highly unjust to continue the incumbrance on Hancock’s property. Muschett’s proper indemnity was in his own hands; in the greater debt that he owed Hancock. The settlement referred to in the release, was the settlement between Hancock and Laird, of the 3d of April, 1805, and not the settlement between Hancock and Muschett. The subsequent conduct of Hancock 'is a proof of the rectitude of his intentions. Murdock, the clerk of Laird, made frequent applications to him for payment of this bond. On these occasions, Hancock informed him that Muschett owed him money; and from this circumstance, taken in connexion with the circumstances above mentioned, I think it highly probable, that he also told him of Muschett’s agreement to paj' the bond for him; but he never intimated that Muschett was authorised to collect the bond from him, nor that he himself was released from the obligation to pay it.
There was no fraud on the part of Muschett or Hancock ; and I have gone into this branch of the subject, not because I think it necessary to the correct decision of the cause, but for the purpose of removing unmerited imputation from the memory of two men long since consigned to .the grave.
I come now to those grounds for a new trial, alleged in the bill, and supponed by testimony, or which may be admitted to be so supported. And here it will not be necessary to go minutely into the evidence; it will be sufficient to state the general results, or the facts which, it is contended, the testimony establishes.
Let it then be considered that the verdict of the jury, although it may have been correctly found, according to the *43 evidence exhibited on the trial, will, nevertheless, work injustice between the parties, if not set aside. Let it be conceded that the appellants, their agent Laird, and their attorney, had no intimation of the nature of the evidence, which the defendant intended to adduce in support of his plea of payment. Let it even be conceded that they did not believe, that the defendant intended any opposition to the judgment which the appellants were in pursuit of. And let it be farther conceded, that they had been previously apprised of the real intentions of the defendant, and of the nature of the evidence on which he relied: that they could and would have introduced such evidence on their part, as to deprive the testimony of the defendant of all its weight, and to establish, clearly and incontrovertibly, their right to the judgment which they demanded. Let all this be conceded; and I am still decidedly of opinion, that the new trial ought not to be granted.
Applications to Courts of Equity for new trials, are extremely rare in England, even on the part of defendants at law; since the Courts of Law exercise the same jurisdiction, and to the same liberal extent. As early as the reign of Charles 2d, (Curtis v. Smalridge, 1 Ch. Cas 43,) the rule was distinctly laid down, that a Court of Equity will not award a new trial to avoid a judgment at law, “on account of any evidence or matter which might have been used in the first cause, and of which the party then had knowledge,” unless some satisfactory reason be assigned, why the party did not avail himself of it, in the trial at law. And I understand the same principle prevails, where the application is not to avoid the whole judgment, but seeks partial relief only. It cannot be necessary to refer to cases to establish this principle. It is to be found every where. The English Courts, have very rarely departed from it. Our own Courts, whilst they have never denied its obligation, have, unfortunately, (I humbly think,) been too often seduced into forgetfulness of it, by a tender regard to the hardship of particular cases. Hence, the va~ *44 riation to be found in the decisions of this Court, and which has sometimes exposed us to the imputation of having no certain system. Hence the course, which has been sometimes pursued, of allowing the defendant to come into equity, to get relief for a payment, on the ground that the payment having been in the knowledge of the plaintiff, it was against conscience in him not to allow it. Hence, also, the practice of allowing the defendant to come into a Court of Equity, after a trial at law, to demand a disclosure of facts from the plaintiff, instead of holding him to demand the discovery before the trial, to be used at the trial.
These remarks are not necessary to the decision of this cause; but they are suggested by the occasion, and they are thrown out as indications, that I am disposed to return to and guard with greater caution., the line which has been wisely drawn between the jurisdictions of Courts of Law and Equity.
' But, a new trial or other relief, will frequently be extended to those who were defendants at law, under circumstances where it would be refused to those who were plaintiffs; and this, not because defendants are greater favourites than plaintiffs with Courts of Justice; but because of the different ground which they occupy. Relief is granted to defendants, because they cannot redress themselves. . Thus, if the trial of a cause once commences, there is no mode by which a defendant can escape from it, whatever may be the eircuihstances which forbid him to expect a just decision. He must await the verdict; and then, if the Courts do not afford him relief, he is without redress. But, the situation of plaintiffs at law is very different. If they find themselves deceived in their own testimony, and think they can stregthen it; or if they be surprised by the introduction of unexpected testimony on the part of the defendant, and believe that it will be in their power at some other time, to explain, ’rebut or disprove it; they can afford themselves the opportunity of doing *45 so, by suffering a non-suit, and commencing their action de novo.
The case before us, is one in which plaintiffs at law are seeking to be relieved from a judgment, which they voluntarily permitted to go against them; and this of itself, is sufficient to shew the inapplicability of all, or nearly all the cases, which have been referred to on their behalf.
The allegation of fraud being put out of the case, the only remaining ground on which the appellants can rely, is the surprise at the trial by the introduction of unexpected testimony.
If the case of the plaintiffs applying for a new trial on such ground, be not materially different from that of a defendant, making the same application on the same ground, whence comes it that no case has been found, where the English Courts have granted a new trial on the ground of surprise ? The case of Bright, ex’or. of Crisp v. Eynon, 1 Burr. 390, may, at first view, be supposed to sanction the granting a new trial to a plaintiff, on this ground. But, if that case be examined, it will be found, that it was decided expressly and solely, on the ground that it was contrary to evidence. None of the Judges but Lord Mansfield said any thing on the ground of surprise; and even he gave no opinion on it, farther than to say, that “ if the matter in dispute was of great value, I will not say that the suspicious circumstances might not be a ground for a new trial.” If this, and some other general.expressions of his, be regarded as the expression of an opinion by that great Judge, that a new trial ought, in any case, to be granted a plaintiff on such ground, I have only to say, that neither he, nor any other Judge in England, has ever acted on that opinion, so far as I am informed. Nor am I aware of any such, case in our own Courts.
The only case that looks that way, is the case of Hawkins v. Depriest, 4 Munf. 469. But that was not the case of an application to equity for a new trial, but a bill for substantive relief on the merits of a case originally and *46 exclusively proper for the Chancery jurisdiction. The ground of the decision were not given by the Court. But it is believed, that the Court must have gone on the ground I have mentioned, viz. that the case was originally and exclusively proper for the jurisdiction of a Court of Equity; for, the party there; having given a deed acknowledging the receipt of the purchase money, he was estopped in a Court of Law, from saying that he had not received it; and.therefore, never could have recovered at law; and the Court of. Equity rightly decided, that it was not deprived of its jurisdiction by a previous nugatory and improper resort to a Court of Law.
There is not only no adjudication supporting the claim of the appellants, but there is direct authority against it. The case of Richards v. Symes, 2 Atk. 319, was an issue out of Chancery, in which a new trial was prayed for on the part of the plaintiff. The Chancellor observed, “ there is another reason that weighs with me; that the new trial is prayed for on behalf of the plaintiff at law; and if it had been better made out, I should not have inclined to grant it; because it was in'his power to have been non-suited; for if the counsel had been of opinion, that there was evidence they were not apprised of, and too strong for them to encounter, they might have advised him to suffer a non-suit; and then he might have come back to this Court for new instructions, who would have ordered another issue at law, notwithstanding the non-suit.” It is impossible not to be struck with the resemblance, or rather the identity of the case supposed by the Lord Chancellor, and that under consideration. In this case, as in that, the plaintiffs were met by “ evidence they were not apprised of, and too strong for them to encounter.” In this ease, as in that, the counsel “ might have advised them to suffer a non-suit.”
The case of Tarpley's adm’r. v. Dobyns, 1 Wash. 185, strongly' resembles this in principle. There, the plaintiff at law had failed to produce evidence, (which evidence *47 was in bis power,) merely because he did not suppose the defendant would make such defence as would render that evidence necessary. But, being surprised in this lar, by the defendants unexpectedly making a defence, which made that testimony indispensable, he, like the appellants in this case, did not suffer a non-suit, but submitted the case to the jury, who found against him. He then filed his bill in equity, stating all the circumstances, and praying that the defendant should be decreed to pay him his debt. There was a demurrer to -the bill for want of equity, which demurrer was sustained. Judge Pendleton, in delivering the opinion of the Court, says; “although the appellant might have resorted to a Court of Equity in the first instance, if his case would bear it, it is now too late, after having made his election to take a trial at law. As to the surprise which is made the pretext for this application to a Court of Equity, it ought not to benefit the appellant in the present case; since, when he discovered a disposition in the appellee to avail himself of his legal advantage at the trial, he might have suffered a non-suit.”
It is no objection to the application of this case to the one under consideration, that in Tarpley's adm'r v. Dobyns, the plaintiffs ought to have known, from the very terms .of the bond, that it would be incumbent on him to prove, at the trial, the very fact which the course of the defendant made it necessary for him to prove. He was, in fact, surprised; and the surprise, whether produced with, or without cause, ought to have admonished him of the propriety and necessity of a non-suit. Nor do I think the case would be varied, even if the surprise were produced by the fraud of the defendant; for even in such case, I would say, in the spirit, if not in the very words, of Mr. Pendleton, “when the plaintiff discovered a disposition in the defendant to avail himself, at the trial, of the advantage which his fraud had given him, he ought to have suffered a non-suit>”
*48 Although I am decidedly of opinion, that a new trial ougbt never to be granted by a Court of Equity to a plaintiff at law, merely on the ground of surprise at the trial, from whatever cause that surprise may have arisen; yet, there are cases, in which a new trial ought to.be granted to him. I would grant it where the verdict was against evidence; as in-the case of Bright, ex’r. of Crisp v. Eynon, 1 Burr. 390; and as is done in every day’s practice; I would grant it, where the damages given by the jury are very inadequate to the injury he had sustained. I would grant it, where there had been any improper conduct on the part of the jury. In short, I would grant him a new trial in all cases, in which, under similar circumstances, I would grant one to the defendant, except where, from the nature of the case, he might have redressed himself by suffering a non-suit. This exception excludes cases where the application, as in the present instance, is founded on mere surprise, produced by the introduction of unexpected testimony at the trial. I would, not grant a new trial in any such case, unless the party was prevented by fraud or accident from suffering a non-suit.
But, if there be any case, in which a plaintiff who has failed to suffer a non-suit, is entitled to a new trial on thq mere ground of surprise at the trial, I should not think that this is one of them. As to the appellants being out of the country, that is entitled to no consideration. They had an agent, Laird, to whom was committed the management of all their concerns. He lived in George Town, but a few miles from the Court of the county where the cause was tried. From the time that he committed the bond to the hands of the attorney, he took no care, and made no enquiry, concerning the suit. The attorney who instituted the suit, “always understood it was to be defended on its merits;” and he who succeeded him, ought to have known it; for, the cause was once, if not oftener, continued at the instance of the defendant, on the ground of- the absence of a material witness. That witness was the clerk of *49 Muschetti; and the object of his testimony was announced to be the verification of some accounts between Hancock and Muschett, on which the defence rested. This circumstanee ought to have shewn, that the plea had not been thrown in as a sham plea, and for mere delay, and was well calculated to indicate the nature of the defence. If this fact, together with the opinion of the first counsel,.had been communicated to Laird, it would have been his duty to attend to the trial of the cause; and if either he or his clerk Murdock, had attended, the result would have been different; for both of them, as appears from their evidence in the cause, were acquainted with facts, sufficient to insure a verdict for the appellants. In the case of Bateman v. Willae, 1 Sch. & Lefr. 201, Lord Redesdale said, that “a bill for a new trial is watched in equity with extreme jealousy, and it must see that injustice has been done, not merely through the inattention of parties.” I entirely concur in this opinion. Men must bear the consequences of their own acts; and those who shut their eyes to the light, ought not to be permitted to complain that they do not see. In this respect, I cannot distinguish between the parties and their attornies.
I am for affirming the decree of the Chancellor.
The President.
The application to the Court of Chancery, in this case, is, to be relieved against a verdict which was found for the defendant, upon what was conceived, at the time, by the parties, a fair trial at law. No objection was made to it in the Court of Law; nor did the plaintiffs complain of it then. The material allegation in the' bill is, (although the plaintiffs went to trial, on the plea of payment,) that they did not dream that any attempt would be made to prove the payment insisted on; and that no instruction was given to their counsel, nor did they, or their agent, attend the trial. Upon the facts in the case, it does not appear that *50 any fraud was practised by the defendant, by which this negligence, on the part of the plaintiffs, was produced; nor does it appear that there was any obstacle, imputable to the defendant, to prevent their counsel, after the testimony was disclosed, from suffering a non-suit. He- freely submitted the case to the jury, and took the chance of a verdict in his favor.
The application, then, for relief, is solely on the ground that great injustice has been done them, in the trial at law. It seems to me very clear, that if a party neglects to avail himself of his remedies for injustice done there, a Court of Equity ought riot to interfere; nor ought a plaintiff to be permitted to deprive his adversary of his trial at law, when nothing is imputable to him. Otherwise, the jurisdiction of a Coui’t of Law would soon be supplanted by that of the Courts of Equity. Neither the neglect of a party, nor his ignorance of his rights at law, furnish any ground for the interposition of a Court of Equity. This doctrine is the more reasonable in its application to plaintiffs at law than to defendants. The former always have it in their power, in a case like the present, to be relieved against surprise on the trial, if any, by suffering a non-suit. They are not compelled, as defendants are, to submit their case to the jury. Though the case of Tarpley’s adm’r. v. Dobyns, 1 Wash. 185, is not, in its circumstances, like the case before us, the principle on which it was decided, is strictly applicable. The Court went on the ground, that the relief asked for in equity, might have been had by suffering a non-suit; and no sufficient excuse for omitting it, being alledged and proved, they affirmed the decree, and dismissed the bill. I admit that this Court, in their solicitude to do justice, may, in some cases, have encroached upon these principles; but they have never been directly over-ruled.
I am of opinion, therefore, to affirm the decree.
Decree affirmed.

 Judges Geeeit and Cami did not sit J the former having decided the cause as Chancellor; and the case having been argued before the latter came into this Court.