February 11.
JUDGE CARR.
Harwood having a claim to several slaves then in litigation, sold this claim to Roys-ton, for 1871. 10s., for which sum Royston executed his bond to him. Royston sold his bargain to Faulkner; and Faulkner, by a contract with Harwood, gave him several notes or orders, &c. in exchange for Royston’s bond. Among these, was the order of Mrs. Steptoe for $210 58 cents, which had been given to Gaines an Attorney, to sue on, and which was transferred to Harwood by an assignment on the receipt of Gaines. Faulkner afterwards contesting the right of Harwood to the money due on this order, received the amount of it himself, and having died, Harwood sued his Administratrix in assumpsit for the amount, and recovered Judgment. *The bill was filed to in join this Judgment, on the ground that Harwood sold, not his right and interest to the slaves merely, but such a share of the slaves themselves, and warranted that share: that this order was given in part satisfaction of that share: that the share has turned out to be nought, the suit having been decided against Harwood’s title; and therefore, Harwood has no claim upon the order: that this would have been proved to the Jury on the trial at Law, if the exhibits B. and D. had been in the knowledge or power of the Plaintiff, at the time of trial; but, that these papers had been put by Faulkner into the hands of Hoomes, an Attorney, who died before the suit was tried; and that these documents had been but lately found among his papers. The bill asks an Injunction, but does not designate the further and final relief expected.
If the Court ought to interfere at all, I presume it must be to grant a new trial, as it is a matter wholly at Law. But, the first question is, as to the jurisdiction.
II is a fundamental principle in Equity, that if a party will suffer a Judgment to pass against him, through neglect, he cannot have relief in Equity, for a matter of which he might have availed himself at Law. Lee & ux. v. Boles, 1 Ch. Cas. 95; Williams v. Lee, 3 Atk. 233. In this last case, Lord Hardwicke lays it down, that it must appear that the Defendant was ignorant, at the time of trial, of the fact which renders the verdict contrary to Equity.
In Bateman v. Willoe, 1 Sch. & Lefr. 201, Lord Redesdale says, “The inattention of parties in a Court of Law, can scarcely be made the subject for interference in a Court of Equity. There may be cases cognizable at Law, and also in Equity, and of which, cognizance cannot be effectually taken at Law, and therefore Equity does sometimes interfere; as in cases of complicated accounts, where the party has not made defence, because it was impossible for him to do it effectually at Law. So, where a verdict has been obtained by-fraud, or where a party has possessed himself improperly of something, by means of which he has an *unconscientious advantage at Law, which Equity will either put out of the way or restrain him from using. But, without circumstances of that kind, I do not know that Equity ever does interfere to grant a new trial of a matter, which has already been discussed in a Court of Law, and over which the Court of Law had full jurisdiction.” He adds, “A bill for a new trial, is watched by Equity with extreme jealousy. It must see that injustice has been done, not merely through the inattention of the parties; but some such reasons as those I have mentioned, must exist.”
Cases might be multiplied beyond number, to show that this is the settled doctrine. This question has been often decided also in this Court; and though sometimes with a little more latitude than, may seem to accord with the true practice, yet generally, and particularly in the later cases, in conformity with the decisions I have quoted. I would particularly refer to the case of Oswald, Denniston & Co. v. Tyler, 4 Rand. 19, where the subject is ably discussed and placed by the majority of the Court, on the true ground. That is not a binding authority, but it has my entire approbation; and I trust we shall not depart from the course there laid down. There is nothing more difficult than to keep this encroaching jurisdiction within due limits. When a case seems to address itself strongly to our justice, we are too apt to-yield to the particular call, without considering its effect upon the general rule. Now, let us apply this rule to the facts in this-case. Does it appear that the documents B. and D. were out of the knowledge and power of the Plaintiff at the trial at Law? She states, that they were found but lately among the papers of Hoomes, who died before the trial. The answer puts her on the proof of this, by the allegation, “that it was extremely improbable, that a de-fence at Law was prevented by any such cause,” and that “a small degree of industry and attention would easily have removed all difficulties on that head.”' Surely after this, she ought to have proved the fact. It was said, that she was an Administratrix, and *might well be supposed ignorant of the facts and papers necessary " for her defence at law. This may be admitted; but surely, it does not dispense with some proof before us, to justify the setting aside a verdict and Judgment at Law. If the papers were placed in the possession of Hoomes, the person who found them after his death, might have given evidence of that fact. As it stands, there is certainly no such fact in the cause; no evidence that the papers were not perfectly within the power of the Administratrix. It will not be said, that her statement in the bill is evidence. *638 If so, the rule would be a nullity. Every one would state enough to give Equity jurisdiction. But here, the answer puts her on the proof. If it ought not to be produced in this case, it would be difficult to state one where it would be necessary. Though an Administratrix, as she has stated the fact in her bill, she might prove it, if the proof existed. The absence of such proof takes away all ground of jurisdiction.
But, another ground to support the jurisdiction is taken. It is said, that this is a Bill of Discovery; and that this is founded on that part of the bill, where the Plaintiff charges, that the consideration of the assignment of the order, was the price of the slaves sold by Harwood to Royston, and by him to Faulkner; which she was unable to prove in a Court of Daw, and still may be unable to adduce positive evidence of it, without a discovery from the Defendant; and in the close of her bill, she calls upon him to answer as to this charge.
If there is any thing in authority, this position is wholly untenable. The objection to it rests on the same ground with that just discussed, that if a party suffers a Judgment to pass against him, through neglect, he will not get relief in Equity for a matter, of which, with due diligence, he might have availed himself at Daw. Now, the Administratrix no where states, that she did not, before the trial, discover, that the assignment of the order, and the purchase of the slaves, were connected. It is clear, indeed *from her bill, that she was aware of that fact, while the case was pending at Daw: and the exhibit C. forming a part of the Daw Record, shows that the fact was attempted to be used, at the trial. If, then, her evidence to establish it was defective, she ought, at once, while the action was pending, to have filed her Bill of Discovery, to enable her to defend herself at Daw. This is the settled practice. Speaking of a Bill of Discovery, Dord Redesdale says, Mitf. 52, “This bill is commonly used in aid of the jurisdiction of some other Court; as to enable the Plaintiff to prosecute or defend an action at Daw,” &c. And the bill must be filed as soon as the party discovers the necessity of appealing to the conscience of the adversary. Equity will not suffer him to spin out litigation, take the chance of a Jury, and failing there, file his bill for a discovery. Leicester v. Parry, 1 Bro. Ch. Cas. 305. A plea that a Writ of Right had been tried and determined against the Plaintiff, was held a good plea to a bill for discovery of matter relative to the title. See also Duncan v. Lyon, 3 Johns. Ch. Rep. 351; Ibid. 395; Thompson v. Berry, 6 Johns. Ch. Rep. 479, where the subject is very well treated.
In the case before us, then, it is a full and decisive answer to the Bill of Discovery, that it is after verdict, and no reason shown why an earlier application was not made. There is no hardship in this rule. It is only saying, that a party shall use ordinary diligence, shall seek a discovery as soon as he ascertains that he wants it. But, the contrary practice would be fraught with much mischief. Where the application is in due time, the effect is only a suspension of the proceeding at Daw till the discovery is had; and then, the case proceeds to Judgment in .the proper forum, and the facts are tried by a Jury. But, if you depart from the rule, you encourage negligence, protract litigation, harass and exhaust the parties, and draw within the jurisdiction of Equity, the- general review of trials at Daw. Opon both grounds, then, respecting jurisdiction, I am *strongly opposed to the bill; and as jurisdiction precedes discretion, it would seem unnecessary to go further. But, as the question was much discussed, I will briefly state what would be my view of the contracts, if the exhibits B. and D. are considered in connection with exhibit C.
B. is the first contract, made 10th of January, 1811. It is drawn very obscurely. The commencement looks like a mortgage; but, the latter part shows distinctly, that it was a sale; whether of the interest, or the share of Harwood, is by no means clear. There are expressions which look each way. But, as I deem this point very immaterial, I shall not further consider it.
Take it that it was a sale of the share ; it will be denied by nobody, that parties may modify or abrogate their contracts; and that a subsequent agreement about the same subject, does change the former, so far as it differs from it. In other words, that the last is the agreement, and the only agreement. On the 4th of March, 1811, not two months after the first contract, the parties made a second so clearly expressed, that it seems to me beyond the reach of doubt. By it, Harwood sells to Royston all his right, title, claim, and interest, to seven negroes, (who are named) and stated that he claimed under the Wills of his father and a Mr. Orrell ; which right, title, claim, and interest, he goes on to warrant. Now, if there can be a contract so drawn as to express a sale of the right and interest of the party to a subject, without a sale of the subject itself, it seems to me, that this contract is so expressed ; and this, I thought, was acknowledged in the argument, but for the warranty. It was asked however, “how will you reconcile the warranty, to a sale of the interest only.” I reply, the clause of warranty can never be resorted to, to ascertain the thing or the interest sold. That is by no means its function. These must be gathered .from the premises, the words expressing what is bought and sold. These govern the warranty; for, a" man never warrants more than he has sold. When, then, it is expressly stated, that Harwood sells his *right, title and interest, how could he warrant more? But, the warranty is as express as the sale. He warrants his right, title and interest. If you ask me, to what such a warranty amounts? I answer, to very little that I can see; certainly (I think) to no more than this, that he has done nothing,, and will do nothing, to affect his right, title and interest, such as existed under the Wills. It seems to me still more strange, to resort, for explanation of this contract, to the former one; especially when this has no reference at all to that. It often *639 happens, that parties, by a subsequent •writing, explain a former contract. This is the natural flow of the stream. But to ¡resort to a former contract, and by it, to change the clear meaning of a later one, •would be to turn the current back upon its source. That Royston understood the contract as a sale of Harwood’s interest only, is further evidenced byT his endorsement on exhibit G. With respect to the slave Daniel, who is stated by the contract to be in Ball’s possession, he says in October, 1811, “I have this day conveyed to George Bail, and to him relinquished all my interest in said slave,” &c. Here we• see a conveyance of his interest only. Then his assignment to Faulkner, “I do hereby assign all my right, title and interest in and to the within mentioned slaves, to Thomas Faulkner and his heirs,” &c. Now, it would hardly be contended, that Faulkner could have recourse to Royston, in case the claim turned out bad ; and yet Royston meant (no doubt) to sell as he bought, to .sell his bargain. If Faulkner could have no recourse to Royston, it would seem strange to say he could have an Equity against Harwood, to stop the money on the order he had assigned him, when this assignment took place, not in a trade about the slaves at all, but in the purchase of the bond of Royston to Harwood. This fact is stated in the answer, and proved by two witnesses, Thrift and Newcomb; who further say, that Faulkner told them he had bought of Royston, Harwood’s claim or right in the slaves.
*Bui it is said, that exhibit D. shows the meaning of the parties in these contracts. This bears date November, 1811, after the contract by which Faulkner had gotten of Harwood, Royston’s bond, in exchange for various orders, &c. <!I do hereby relinquish all mj' right, title and interest, in certain negroes conveyed and sold by me to C. Royston, who sold and conveyed the same to Thomas Faulkner. I sold to Royston my right to only one half that property,” &c. stating, that he after discovered that he had a right to two thirds, and had that day received satisfaction of Faulkner for the two thirds. This paper was intended, it seems to me, merely to sell the additional claim, and acknowledge satisfaction ; and not, in the slightest degree, to change the nature of the former contract. Where it refers to that contract, it is mere recital; “negroes conveyed and sold by me to Royston, who sold and conveyed to Faulkner.” But, how sold and conveyed? Why, a.s by the contract is declared. But we see, that when he relinquishes, it is still his right, title and interest; and when he speaks of his sale to Royston, he says, “I sold my right to one-half;” always clearly evincing, that it was his claim, his right, his interest, whatever that might be, that he meant to sell. All this, it seems to me, would be the natural course of such a trade. All the parties knew, that the slaves were in litigation. They were, of necessity, a subject for speculation. They might be something or nothing, as the suit should eventuate. Any ■one who wished to speculate, would enquire into the title, and regulate his bids accordingly. In all such cases, the party weighs the chance of gain, against the hazard of loss. He makes his bargain with his eyes open, and he has no shadow of Equity to be relieved from loss, when it falls on him.
My opinion, therefore, clearly is, that 1st, the party has no right to be heard in Equity, and it is on this ground distinctly, that I choose to place my opinion; but2ndiy, *if the party were received, I think he shows no case for relief; and therefore, that the Decree of the Chancellor be affirmed.
JUDGE COALTER.
I would have been strongly inclined to grant relief in this case, had the Appellant proved the two important matters stated in her bill, to wit: the discovery of the papers amongst those of Hoomes, after the trial, and the failure of the consideration of the assignments on which the suit at Law was founded. The answer, by doubting the truth of the first, and stating that it was extremely improbable, put the Appellant on the proof of it, which she has failed to adduce. The bill does not state, in what manner the consideration failed; whether because the Appellee never had any just claim to the slaves, and that so the suit was decided against him; or, because he had sold them previous to the sale under which the Appellant’s intestate claimed them.
The Appellee admits, that the suit was decided against his title; but says, that an appeal was taken, which was dismissed for want of prosecution; which, being the fault of the Appellant’s intestate, for whose benefit it was taken, he ought not to be responsible; and he examines a witness to prove his title to them, as the dower slaves of his father’s widow. The record of the suit concerning these slaves, is not before us; nor is it even stated, what has become of it, except in the answer as aforesaid. It is not material, therefore, what my opinion might be, as to the t*"ue meaning of the contract of sale, inasmuch as, for these reasons, I am obliged to affirm the Decree of the Chancellor.
The PRESIDENT.
After a trial at Law, new trials should not be granted by a Court of Equity, merely because injustice may have *been done at Law. A party, to entitle himself to a new trial, must show that he has been guilty of no laches: that he has done every thing that could be reasonably required of him, to obtain relief at Law. Without such excuse, which is to be judged of according to the circumstances of the case, he cannot get relief in a Court of Equity. It does not appear, that the documents B. and D. were out of the power of the Defendant, at the time of the trial of the suit at Law ; and being put on the truth of that fact by the answer, some evidence of a matter so susceptible of proof ought to have been adduced, to entitle him to relief in Equity. Indeed, it is not probable, that as the document C. which belonged to the same transaction, was before the Jury, the documents B. and D. were not also *640 in the power of the Plaintiff in Equity, if due diligence had been used to procure them.
As to the other ground of relief, a ' discovery from the Defendant, if at all expected by the Plaintiff, it was more necessary in the absence of the documents B. and D., which are all now in the record, than since the trial at Daw; and although I would not, in every case, limit the right of a party to a Bill of Discovery, to the pendency of the suit at Ea'w, I think, in this case, there has been evident negligence in the Plaintiff, in not filing her bill, pending the suit at Law, if any discovery was expected from the answer of the Defendant.
In addition to this, I see qothing in the answer, which ought to change the verdict of the Jury. On neither ground, do I think that there is any error in the Decree, and I am therefore for affirming it.
Decree affirmed.*

 Judges Gbeen and Cabell, absent.