# Staunton.

## THE MATHIESON ALKALI WORKS v. VIRGINIA BANNER COAL CORPORATION AND OTHERS.

September 18, 1924.

1. EQUITY—*Cross Bill—Answer to Cross Bill—Motion to Strike Out—Matters Alleged in Original Bill—Case at Bar.*—In a suit by a coal company against a consumer upon a contract under which consumer was to take a certain amount of coal from the company at a certain price, complainant's answer to defendant's cross bill denied that defendant had put the proper construction upon the contract and set out in detail its construction of the contract. Defendant moved to strike out these allegations. Substantially the same contention as to the proper construction of the contract was made in the original bill, and the answer was simply an amplification of the contention made in the original bill.

   *Held:* That if the motion to strike out had been sustained, it could have been of no advantage to defendant.

2. EQUITY—*Cross Bill—Answer to Cross Bill—Motion to Strike Out—Claim Arising Pending Litigation—Case at Bar.*—In the instant case, a suit by a coal company against a consumer upon a contract under which consumer was to take a certain amount of coal from the company at a certain price, in its answer to defendant's cross bill complainant set up an item of charge for matters arising since the suit was brought. Defendant moved to strike out this item.

   *Held:* That as defendant was claiming large damages against complainant growing out of the contract, a court of equity would settle all questions growing out of the contract and would not turn complainant out without settling its claim, even though the claim arose pending litigation.

3. EQUITY—*Cross Bill—Answer to Cross Bill—Motion to Strike Out—Deferring Action—Case at Bar.*—In the instant case, a suit by a coal company against a consumer upon a contract under which consumer was to take a certain amount of coal from the company at a certain price, defendant moved to strike out several allegations in complainant's answer to defendant's cross bill. The court decided nothing as to any of the motions to strike out, except that it would defer action until evidence was taken.

*Held:* That there might be many good reasons for this course, and certainly it could not be said to be reversible error.

4. EQUITY—*Pleadings—Exception to Answer—Decision Deferred until Evidence Taken.*—An exception to an answer does not stand on any higher ground than a demurrer, and it is not uncommon practice for trial courts, in equity cases, to defer a decision on demurrer until the case has been developed on the evidence, and the practice has been approved by the Supreme Court of Appeals.

5. APPEAL AND ERROR—*Final Decree—Adjudicating Principles of the Cause—Case at Bar.*—In the instant case, a suit by a coal company against a consumer upon a contract under which consumer was to take a certain amount of coal from the company at a certain price, complainant's answer to defendant's cross-bill denied that defendant had put the proper construction upon the contract and set out in detail its construction of the contract. Defendant moved to strike out these allegations. The court reserved its decision on the motion to strike out until after the taking of the testimony in the case.

*Held:* That the refusal to pass on the motion to strike out the portions of the answer referred to did not adjudicate any principles in the case, nor establish any rules of evidence that would in any way affect the right of the parties.

6. APPEAL AND ERROR—*Final Decree—Adjudicating Principles of the Cause—Establishing Rules of Evidence—Case at Bar.*—In the instant case, a suit by a coal company against a consumer upon a contract under which consumer was to take a certain amount of coal from the company at a certain price, complainant's answer to defendant's cross-bill denied that defendant had put the proper construction upon the contract and set out in detail its construction of the contract. The court referred the case to a commissioner, with directions to take proof on the issues raised therein, and also to consider any other proofs offered by the parties, and to state and settle an account between the parties. Both parties had prayed that an account might be taken. Defendant contended that parol evidence was not admissible to aid in the construction of the contract, and that therefore this order was a decision adverse to it.

*Held:* That as the order of reference decided nothing as to the proper construction of the contract, there was no force in this contention.

7. APPEAL AND ERROR—*Jurisdiction of Supreme Court of Appeals—Final Decree.*—The jurisdiction of the Supreme Court of Appeals is appellate only, except in cases of *habeas corpus*, mandamus, or prohibition (Constitution, section 88), and until the trial court has decided something, it is without jurisdiction to review the action of the trial court. In order to give the court jurisdiction of an appeal in a chancery suit, the decree sought to be reviewed must be a final decree, or one dissolving an injunction, or requiring money to be

paid, or the possession or title of property to be changed, or adjudicating the principles of the cause.

8. APPEAL AND ERROR—*Adjudicating the Principles of the Cause—Decree Postponing Hearing and Ordering the Reference to a Commissioner—Case at Bar.*—In a suit by a coal company against a consumer, involving a contract under which the consumer was to purchase from the coal company a certain amount of coal per year at a certain price, a decree which simply postpones the hearing on the merits until a later date, and orders a reference to a commissioner to take an account, which had been prayed for by both parties in their pleadings, cannot, under circumstances like those in the instant case, be said to adjudicate the principles of the cause. The order of reference may constitute error to be corrected when the case is properly before the Supreme Court of Appeals, but to be ground for appeal it must, in effect, at least, adjudicate the principles of the cause. It must decide something. In the instant case, when read in connection with the pleadings, the order of reference shows on its face that the court did not intend to adjudicate the principles of the cause.

9. EQUITY—*Reference—Reference to Enable Party to Make out a Cause.*—It is error to refer a case to a commissioner to enable a party to make out a case.

10. APPEAL AND ERROR—*Issue to Jury—Improperly Awarded.*—If an issue out of chancery is improperly awarded, the case will be reversed.

11. APPEAL AND ERROR—*Reference to Commissioner as Invasion of Parol Evidence Rule—Case at Bar.*—The instant case involved the construction of a contract between complainant, a coal company, and consumer. The court ordered a reference to a commissioner to take proof on the issues raised, to consider any other proofs offered by either of the parties in support of their claims, and to state and settle an account of the claims. Defendant contended that this order of reference was an invasion of the parol evidence rule, insisting that the contract spoke for itself, that it was plain and unequivocal and could not be affected by any parol testimony.

*Held:* That there was no force in this contention, as the possibility that inadmissible evidence may be offered is no reason for refusing the opportunity of presenting that which is admissible. The trial court did not pass on any of the questions as to the admissibility of parol evidence, and the Supreme Court of Appeals cannot review a decision not made.

12. PAROL EVIDENCE—*General Rule—Exceptions.*—The Supreme Court of Appeals has steadfastly upheld the parol evidence rule in this State, and still adhere to it in its integrity; but there are some exceptions to the rule, as well established as the rule itself, and there are circumstances under which the rule does not apply.

13.   REFERENCE—*Construction of Contract—Reference Before Evidence is Heard—Case at Bar.*—The instant case involved the construction of a contract between a coal company and a consumer, and it would have been more proper for the trial court to have heard the evidence and have construed the contract before making an order of reference, but as a reference was asked for by both parties in their pleadings, and as it seemed inevitable at some stage of the proceedings, the time of making it was a mere question of procedure and furnishes no ground for reversal.   It is doubtful if either time or expense will be saved by taking up the case piecemeal, but, as the order of reference has not been executed, the trial court should set it aside, and, after giving the parties a reasonable time to produce their evidence, if any they have, construe the contract before renewing the order of reference.

14.   APPEAL AND ERROR—*Interlocutory Decree—Case at Bar.*—It is not unusual for the Supreme Court of Appeals to refuse an appeal from an interlocutory decree until the case is more fully developed on its merits.   Such a refusal does not bar a subsequent application when the case has been so developed, and especially after a final decree has been entered.   The Supreme Court of Appeals was of the opinion that the instant case should take that course, and for that reason the present appeal was dismissed as improvidently awarded, and without prejudice to the appellant to apply for an appeal from a final decree in the cause, or from a decree adjudicating the principles of the cause, after the parties had submitted their evidence.

Appeal from a decree of the Circuit Court of Dickenson county.   From an order of reference defendant appealed.

*Appeal   dismissed.*

The opinion states the case.

*Buchanan   &   Buchanan,   Hutton   &   Hutton,   White, Penn   &   Stuart,   Rushmore,   Bisbee   &   Stern,* for the appellant.

*E.   M.   Fulton,   W.   H.   Rouse,   Walter   H.   Robertson* and *Joseph L. Kelly,* for the appellees.

BURKS, J., delivered the opinion of the court.

In the year 1917 the Virginia Banner Coal Corporation, hereinafter called the coal company, owned a lease for a long term on a large boundary of coal land, but had neither plant nor equipment, and hence was producing no coal.  At the same time, the Mathieson Alkali Works, hereinafter called the alkali works, was an established manufacturing industry operating a considerable plant, and using a large quantity of coal. Thereupon a written contract was entered into between them, bearing date September 1, 1917, by which the alkali works loaned to the coal company $150,000.00 and the coal company raised $50,000.00, all of which was expended by the coal company in developing its lease and in providing a plant and equipment for the production and shipment of coal.  The contract provided, amongst other things, for the security of this loan by a first mortgage on the plant and equipment of the coal company, the creation of a sinking fund, the payment semi-annually of interest at six per cent, and of $25,000.00 of the principal on July 1, 1921, and of $25,000.00 annually thereafter until all the principal was paid.  The contract also contained the following clause, which is the chief bone of contention:

1. "(a) The alkali works agrees to buy and pay for and the coal corporation agrees to sell and deliver, f. o. b. cars at the mines, for and during the term of ten (10) years from April 1, 1918, until April 1, 1928, at the price hereinafter specified, the annual requirements of coal of the alkali works, estimated approximately at 200,000 tons per annum, to be delivered, as specified by the alkali works, in approximately equal monthly installments of the following proportions and grades: "133,000 tons of nut and slack coal, such as will pass through bar screen, the bars of which are one and one-half inches apart.

"67,000 tons of egg and lump coal, such as will not pass through bar screen, the bars of which are one and one-half inches apart, and will pass through bar screen, the bars of which are four (4) inches apart.

"The said two grades of coal shall be of such quality as is required, as of this date, by the United States Government for coal supplied to the soldiers' home at Johnson city, Tennessee, and shown upon the specifications hereto attached, marked 'Specifications.'

"(b) Payment for the said coal shall be made by the alkali works to the coal corporation monthly, on or before the 20th day of each month, for the coal so delivered during the preceding month, price per ton to be paid by the alkali works for said coal shall be in the average per ton cost f. o. b. cars during the month in which the coal is mined, plus a profit of twenty-five cents ($0.25) per ton; provided, however, that in determining such price the item representing the cost per ton f. o. b. cars shall in no event exceed the 'standard cost' as hereinafter defined, and, in the event that during any month the coal corporation's cost per ton exceeds such standard cost, the alkali works shall pay for the coal mined during such month standard cost plus a profit of twenty-five cents per ton. The term 'standard cost' as used in this agreement shall mean the average cost per ton f. o. b. cars for any such month or months of the coal mined by the Stonega Coal and Coke Company, Clinchfield Coal Corporation and Virginia Iron, Coal and Coke Company at their Southwest Virginia operations. In event detailed cost figures of said companies for any month are not available to the parties hereto, then the cost per ton to be charged the alkali works shall be the average cost per ton f. o. b. cars during said month of three efficiently

managed and well located collieries at the time operating in the Southwest Virginia coal fields, which cost of production shall be determined from the best evidence by a majority of three competent, disinterested arbitrators, to be named as hereinafter, in section fourth, paragraph (a), provided: cost of any such arbitration to be borne equally by the alkali and the coal corporation.

"The alkali works, or its duly authorized agent, for the purpose of ascertaining the coal corporation's cost per ton, shall be entitled to demand and receive from the coal corporation all information relating to and necessary for the matter of such determination, and to verify the same by an examination and audit of the books, records and accounts of the coal corporation.

"(c) The coal corporation agrees that all coal sales made by it to third persons shall be made subordinate to and dependent upon the said delivery to the alkali works of its average monthly coal requirements."

This suit was instituted in October, 1921, and since then there have been bills, amended bills, cross-bills, pleas in abatement, an application for a writ of prohibition, demurrers, answers, exceptions to answers, appeals, an action at law, and injunctions. Each party has endeavored to plead the other out of court, and the dominant idea pervading the record seems to be an apprehension on each side that one of them may say something that the other has not denied. Meanwhile, the trial court has decided nothing, and the parties are practically where they were at the beginning of the litigation.

The original bill was filed by the coal company, alleging various breaches of the contract of September 1, 1917, which was exhibited with the bill, claiming large damages therefor, and also alleging an effort on the part of the alkali works to work the financial ruin

of the coal company. The bill insisted that the contract required the alkali works to take 200,000 tons of coal per annum, and averred its willingness and ability to perform the contract as to quantity, quality and grades of coal to be furnished by it. The bill also prayed for a mandatory injunction to require the alkali works, in the future, to receive and pay for 200,000 tons of coal per annum, and also a large sum of money for having failed theretofore to take coal from it at that rate.

The injunction was granted by the judge of the Circuit Court of Dickenson county. Thereupon the alkali works applied to this court for a writ of prohibition which was refused, and subsequently perfected an appeal to this court, on the ground that the Circuit Court of Dickenson county was without jurisdiction to hear and determine the case. Before the appeal was heard the parties made a compromise agreement in which the injunction was dissolved and the contract of September 1, 1917, was abrogated for the future and all parties were left free to pursue any remedies they had for breaches of the contract prior to the compromise agreement. Thereupon the alkali works dismissed its appeal before a hearing was had.

Subsequently, the alkali works filed its answer and cross-bill, claiming large damages for alleged breaches of the contract of September 1, 1917, on the part of the coal company. The coal company undertook to dismiss the present suit, and filed a declaration in assumpsit for the purpose of proceeding at law. On the petition of the alkali works, filed herein, the court enjoined the prosecution of the action at law.

The coal company then filed its answer to the cross-bill in which it undertook to deny every affirmative allegation of new matter set up in the cross-bill. The

cross-bill had set up the construction of the alkali works of the contract of September 1, 1917, on the subjects of (1) the quantity of coal the contract required the alkali works to purchase of the coal company annually, (2) the price per ton to be paid by the alkali works, and (3) the quality of coal to be furnished by the coal company. The answer of the coal company denied that the alkali works had put the proper construction upon the contract and set out in detail its construction thereof. This was nothing more than an amplification and a statement more in detail of the claim made by the coal company in its original bill. The alkali works moved to strike from the answer the allegations on these three points. It also moved to strike out the allegation of the answer as to an item of charge set up by the coal company for matters arising since the suit was brought. The court, however, did not pass on any one of these motions, but simply deferred its decision. The language of the decree of October 5, 1923, is "and the court, being now advised, is of opinion to reserve its decision on the motion to strike out until after the taking of the testimony in the case. It is therefore ordered that the parties will be permitted to take proof on all questions at issue under the pleadings as desired, subject to objections, and the court's decision upon the said motion to strike out will be reserved until the case is submitted for final determination of all questions."

This action of the court is assigned as error, and *Clarke* v. *Tinsley's Adm'r*, 4 Rand. (25 Va.) 250, is cited to support the assignment.

[1] The chief objection is to the ruling refusing to strike out the three paragraphs relating to the construction of the contract of September 1, 1917. It is an all sufficient answer to say, that if the motion to strike

out had been sustained, it would have been of no advantage to the alkali works, as it would have left the case where it stood before. Substantially the same contention as to the proper construction of the contract was made in the original bill, and the answer was simply an amplification of the contention made in the original bill. If this part of the answer had been stricken out, there would still have remained the contention of the coal company, set out in the bill, and that of the alkali works, set out in the cross-bill. A question of law to be decided by the court.

[2] As to the item of charge by the coal company against the alkali works, arising since the litigation commenced, it may be said that the alkali works was claiming large damages against the coal company growing out of the contract, and even though the claim arose pending litigation, a court of equity, with all the parties before it and required to adjust and settle all questions between them growing out of the contract, would not turn the coal company out without settling its claim, but would do complete justice between the parties. A court of equity will not take two bites at a cherry.

[3, 4] The court decided nothing as to any of the motions to strike out, except that it would defer action until the evidence was taken. There may have been good reasons for this course. Certainly it cannot be said to be reversible error. An exception to an answer does not stand on any higher ground than a demurrer, and it is not uncommon practice for trial courts, in equity cases, to defer a decision on demurrer until the case has been developed on the evidence, and the practice has been approved by this court.

The case of *Clarke* v. *Tinsley's Adm'r*, 4 Rand. 25) Va.) 250, is relied on by the appellant to sustain its

position that it was reversible error to order an account before passing on its motion to strike out, but the facts are so entirely different from those of the instant case as to bear little resemblance to it.  That was a bill for *discovery* and relief.  The plaintiff sued to recover the value of certain clerk's tickets which had been placed in the hands of the defendant, as sheriff or deputy sheriff, for collection.  The receipt for the tickets had been lost, and hence the plaintiff, being unable to sue at law, brought his suit in equity.  The sole question involved was the liability of the defendant for the clerk's tickets, and this could not be established without proof that they went into his hands.  The bill called for a discovery of this fact and of the disposition he had made of the proceeds.  This could only be shown by the discovery prayed.  The answer of the defendant "gives a rather lame account of the matter, speaks of the books, of tickets being entered in them, of payments made, etc., but produces no extracts."  The answer was excepted to as insufficient.  There was no replication to the answer.  In this condition of the record, without passing on the exception, the trial court referred the case to a commissioner to state an account between the parties.  "The commissioner reported a balance against the defendant, stating that the account was founded on the bill and answer and deposition of Jeffries.  After the report was returned, but before it was acted on, the defendant took two depositions. * * The chancellor, in October, 1920, rendered a decree on the report, as one to which there was no exception."  The deposition of Jeffries referred to by the commissioner had been suppressed by the withdrawal of the replication which had been previously filed to the answer.  This left the case without any issue between the parties, the plaintiff without any opportunity to

reply if the answer was held sufficient, and the defendant without opportunity to amend if his answer was held insufficient, and the case without evidence on the matter in controversy. It was of this record that the court said: "The proceeding upon the exceptions to the answer was wholly irregular," and this led to a reversal of the case.

In the instant case, the original bill set out the contract of September 1, 1917, its construction thereof, the breaches thereof and the resulting damages, and various other wrongful acts and doings of the defendant. To this bill the defendant filed its answer denying every allegation of wrongdoing on its part, or that the coal company was entitled to any damages; denying the latter's construction of the contract; alleging breaches by the coal company entailing damages of over a million dollars, and praying that its answer might be treated as a cross-bill. These charges and countercharges made the issue between the parties, which remained in the cause, even if the motion to strike out had been sustained. The coal company answered the cross-bill, again putting in issue the demands and counterdemands of the parties. There could be no difficulty in directing the evidence to the questions at issue between the parties, nor was any discovery asked of the defendant. Under existing rules of evidence, there was no need for discovery. The points of difference are set forth at great length in the pleadings, and no such difficulties exist relating to the competency of witnesses to testify, as existed when *Clarke* v. *Tinsley's Adm'r* was decided. That case throws little, if any, light on the case made by the pleadings in the instant case.

[5] The refusal to pass on the motion to strike out the portions of the answer referred to did not adjudi-

cate any principle in the case, nor establish any rule of evidence that would in any way affect the rights of the parties.

It is assigned as error that the trial court permitted the complainant to file its second amended bill. It is too plain for argument that this is neither a final decree nor one adjudicating the principles of the case. Indeed, appellant admits that, standing alone, the decree is not subject to review at this stage of the case.

[6] The most serious objection urged to the rulings of the trial court was the making of the order of reference on January 15, 1924, before construing the contract of September 1, 1917. By this decree, the case was referred to a commissioner with directions to "take proof on the issues raised therein" and also to "consider any other proofs offered or filed herein by either of said parties in support of their respective claims as set out in the pleadings herein," and he was directed to "state and settle an account of said claims between said parties," and to report to the court his findings thereon and any other matter required by the parties or which he might deem pertinent to said issue, and to return with his report all evidence taken by or filed with him.

It is said that this was a decision adverse to the alkali works upon the proper construction of the contract, and also determined the rule of evidence by which the rights of the parties were to be worked out. Such was not the effect of the decree. It decided nothing as to the construction of the contract, and the appellant elsewhere complains because the court did not first construe the contract, and it is silent on the subject of any rule of evidence by which the commissioner was to be governed. Each party was claiming large damages of the other for breach of the contract, and the parties were at issue on these demands, and each party had, in

the pleadings, asked for an order of reference. One of the prayers of appellant's cross-bill was "that the matters set forth in the original and amended bill, answer and cross-bill be referred to a commissioner, who shall take and state an account," etc. So that the question of the time at which the order of reference should be made was one of mere procedure. It is manifest that there was no such adverse decision to the appellant on the merits, for if the decision was in its favor, a reference would still have been necessary to ascertain what were the requirements of the alkali works during the period of controversy, and whether it took all of these requirements of the coal company and if not what damages, if any, the coal company was entitled to recover, as well as the damages sustained by the alkali works by reason of the matters set up in the cross-bill. There was also involved the question of the quality of the coal; the coal company claiming that the coal had been analyzed and accepted, and if not, objections thereto waived by accepting it for three years, and the alkali works denying the claim and asserting large damages. An order of reference, at some state of the case, was not only prayed for by both parties, but was plainly necessary.

As the order of reference decided nothing as to the proper construction of the contract, or the rule of evidence by which the rights of the parties were to be ascertained, *Johnson* v. *Mundy*, 123 Va. 730, 97 S. E. 564; *Lancaster* v. *Lancaster*, 86 Va. 201, 9 S. B. 988, and other cases on this line cited by the appellant, are not applicable.

[7, 8] The jurisdiction of this court is appellate only, except in cases of *habeas corpus*, mandamus, or prohibition (Constitution, section 88), and until the trial court has decided something, it is without jurisdiction to review the action of the trial court. In order to

give the court jurisdiction of an appeal in a chancery suit, the decree sought to be reviewed must be a final decree, or one dissolving an injunction, or requiring money to be paid, or the possession or title of property to be changed, or adjudicating the principles of the cause.   Code section 6336.   The order of reference did none of these things.

What amounts to adjudicating the principles of a cause is not always an easy question to answer, but the facts of the instant case do not present difficulty.   A decree which simply postpones the hearing on the merits until a later date, and orders a reference to a commissioner to take an account, which had been prayed for by both parties in their pleadings, cannot, under circumstances like those in the instant case, be said to adjudicate the principles of the cause.   The order of reference may constitute error. to be corrected when the case is properly before this court, but to be ground for appeal it must, in effect, at least, adjudicate the principles of the cause.   It must decide something.

The West Virginia statute on appeals contains the same language as the Virginia statute.   In *Armstrong* v. *Ross*, 56 W. Va. 16, 48 S. E. 745, the judge of the trial court, in an order of reference to a surveyor to make a survey of land, expressed the opinion that the plaintiff was entitled to recover the land claimed by him, and there was an appeal on the ground that the order of reference adjudicated the principles of the case. Judge Dent, speaking for the court, said: "Under our statute, appeals are allowable in any case in chancery wherein there is a decree or order adjudicating the principles of the cause.   Section 1, chapter 135, Code.

"The expression of opinion of the court is not such an adjudication, although an order of reference, prop-

erly or improperly, is entered in furtherance of such opinion.

"The matter is still in the breast of the court and the judge may change his opinion before entering an appealable decree."

This decision was followed in *Hill* v. *Cronin,* 56 W. Va. 174, 49 S. E. 132, 3 Ann. Cas. 170, where, after stating the facts, it was said that the order of reference did not adjudicate the principles of the cause.

See also *Rainey* v. *Freeport, etc., Co.,* 58 W. Va. 381, 52 S. E. 473; *Benedum* v. *First Citizens' Bank,* 72 W. Va. 124, 73 S. E. 656, 664.

In *Higginbotham* v. *Brown,* 22 Gratt. (63 Va.) 323, Brown sued for 150 acres of land, part of a boundary of 2,684 acres. The trial court held that Brown was entitled to recover the 150 acres and directed a surveyor named to go on the land and lay off the 150 acres by metes and bounds and report to the court. Before the survey was made the defendant obtained an appeal from the decree. It was held that the appeal should not have been allowed, and it was dismissed as improvidently awarded. Judge Moncure concludes the opinion of the court as follows:

"The court is of opinion that it was most proper that the case should be proceeded in farther in the court below before an appeal was allowed therein. It can be better ascertained after the survey is made and reported to the court, with any facts elicited thereby of evidence connected therewith, whether the said decree is proper or not; and if not, what decree ought to be made in the case as it may then exist, which decree it will be competent then for the court to make. The court is, therefore, of opinion that the said appeal was prematurely and improvidently allowed, and it is decreed and ordered that the same be dismissed, and

that the appellant pay to the appellee, Brown, his costs by him about his defense in this behalf expended. And the case is remanded to the court below for further proceedings to be had therein."

Without reference to these cases, however, the order of reference in the instant case, when read in connection with the pleadings, shows on its face that there was no intention on the part of the trial court to adjudicate the principles of the cause.

[9,10] Counsel for the appellant cite a number of cases to support the well settled doctrine in this State, that it is error to refer a case to a commissioner to enable a party to make out his case. Several of them are cited by Judge Keith in his opinion in *Baltimore Steam Packet Co.* v. *Williams*, 94 Va. 422, 26 S. E. 841. A number of cases are also cited to show that if an issue out of chancery is improperly awarded the case will be reversed. See *Catron* v. *Norton Hardware Co.*, 123 Va. 380, 386, 96 S. E. 853 and cases cited. Neither of these propositions is questioned, but the application of the cases is denied.

Our conclusions are based on the facts peculiar to the instant case.

[11,12] Counsel for the appellant construe the order of reference as an invasion of the parol evidence rule, and insist that the contract speaks for itself, and that it is a plain, unequivocal contract in writing that cannot be affected by any parol testimony, or prior or contemporaneous agreement of the parties, and have argued the question very fully and ably. We have steadfastly upheld the parol evidence rule in this State, and still adhere to it in its integrity (*Whitaker* v. *Lane*, 128 Va. 317, 104 S. E. 252, 11 A. L. R. 1157), but there are some exceptions to the rule, as well established as the rule itself, and there are circumstances

under which the rule does not apply (*Towner* v. *Lucas' Ex'r*, 13 Gratt. [54 Va.] 705). Again, there are questions upon which the cases are in conflict; for example, whether certain collateral parol agreements are admissible in evidence. See 2 Williston on Contracts, section 642, and cases cited; *Slaughter* v. *Smither*, 97 Va. 202, 33 S. E. 544.

It is also claimed by the appellee that the term "annual requirements of coal of the alkali works, estimated at 200,000 tons per annum, to be delivered, as specified by the alkali works, in approximately equal monthly installments of the following proportions and grades: 133,000 tons of nut and slack, 67,000 tons of egg and lump," is an equivocal term, which would be rendered plain by testimony of the facts and circumstances surrounding the parties at the time the contract was entered into. The trial court did not pass on any of these questions, and this court cannot review a decision not made.

It is the duty of the trial court to construe the contract in the light of such evidence as is properly admissible, but the admissibility of the evidence cannot be passed upon till offered. If the appellee has any admissible evidence it should be allowed a reasonable opportunity to present it, and a similar opportunity should be afforded the appellant to reply. The order of reference was probably made to afford this opportunity, but, if set aside, a reasonable opportunity should be afforded the parties to offer such evidence, if any they have, as is admissible to aid the court in the proper construction of the contract. The possibility that inadmissible evidence may be offered is no reason for refusing the opportunity of presenting that which is admissible.

[13] In the instant case, it would have been more

proper for the trial court to have heard the evidence and have construed the contract before making the order of reference, but as a reference was asked for by both parties in their pleadings, and as it seemed inevitable at some stage of the proceedings, the time of making it was a mere question of procedure and furnishes no ground for reversal. It is doubtful if either time or expense will be saved by taking up the case piecemeal, but as the order of reference has not been executed, the trial court should set it aside, and, after giving the parties a reasonable time to produce their evidence, if any they have, construe the contract before renewing the order of reference. None of the decrees or orders so far entered in the cause have adjudicated the principles of the cause.

[14] Furthermore, it is not unusual for this court to refuse an appeal from an interlocutory decree until the case is more fully developed on its merits. Such a refusal does not bar a subsequent application when the case has been so developed, and especially after a final decree has been entered. We are of opinion that the instant case should take that course, and for that reason the present appeal will, be dismissed as improvidently awarded, and without prejudice to the right of the appellant to apply for an appeal from a final decree in the cause or from a decree adjudicating the principles of the cause, after the parties have submitted their evidence.

*Appeal dismissed.*

SIMS, P., dissenting:

I find myself unable to concur in the conclusion of the majority opinion, that the last decree of reference, under review, does not decide any principle of the

cause; or the conclusion that the cause should be remanded for extrinsic evidence, if offered, to enable the court to construe the written contract involved in this suit.

The decree expressly provides that the commissioner "shall take proof on the issues raised herein and shall also consider any other proofs offered or filed herein by either of said parties in support of their respective claims as set out in the pleadings herein * * and shall state and settle an account of said claims between said parties." The chief issue in the cause is the proper construction of clause 1 of the contract, of date September 1, 1917; and upon that issue the pleadings clearly and distinctly presented to the court below for decision the question of whether evidence, alleged by the appellees in their pleadings, of the prior negotiations between the parties leading up to the contract, tending to show an intention on the part of the parties different from that expressed in the contract, is admissible to alter or vary the plain meaning of the contract as expressed by its own unambiguous words. When the decree of reference directed the commissioner to admit "any * * proofs offered or filed * * by either of said parties in support of their respective claims as set out in the pleadings herein," the effect of this was to direct the commissioner to admit the character of proof just mentioned and to base his conclusions thereon, and it decided that such evidence was admissible to show the meaning of the contract, and thus decided upon what evidence the rights of the parties must be finally worked out in the cause; and so settled the principles of the cause to that extent. *Reed* v. *Cline's Heirs,* 9 Gratt. (50 Va.) 136, 138; *Wise* v. *Lamb, Idem.* 294, 309;

*Lancaster* v. *Lancaster*, 86 Va. 201, 204, 9 S. E. 988; *Johnson* v. *Mundy*, 123 Va. 730, 97 S. E. 564.

As said in *Reed* v. *Cline's Heirs:* "The decree directing the issues must be understood as settling the principles of the cause to this extent: If the jury should find the issues favorably to the complainants, they should have the relief prayed for, otherwise it would be an idle waste of time and costs to try the issues at all. Regarding the decree of the court in this light and holding that it settled the principles of the cause erroneously * * I am of opinion that this court may take cognizance of the appeal."

As said in *Lancaster* v. *Lancaster:* "It is difficult, if not impossible, to define exactly what is meant by adjudicating the principles of the cause in such a way as to fit every case, but it must mean that the rules or methods by which the rights of the parties are to be finally worked out have been so far determined that it is only necessary to apply those rules or methods to the facts of the case in order to ascertain the relative rights of the parties with regard to the subject matter of the suit."

As said in *Johnson* v. *Mundy:* "The order in the instant case determined the rule of evidence by which the rights of the parties are to be finally worked out, which is the same thing, in substance, as determining the rule by which the rights of the parties are to be finally worked out."

I think that the decree was plainly wrong in deciding that the parol evidence aforesaid is admissible for the purpose aforesaid. Under the settled rule on the subject, whatever passed between the parties in the negotiations leading up to the contract was merged in the written contract.

There are, it is true, as stated in the majority opinion,

exceptions to the parol evidence rule, and questions touching that rule upon which the cases are in conflict. But the character of the facts sought to be shown by the appellees by the extrinsic evidence appears from the pleadings of the appellees, and it is apparent from such pleadings that such evidence is inadmissible for the purpose of varying or altering the plain meaning of the contract as it is written, under the rules on the subject which may be considered as settled in this jurisdiction.

Nothing need be added to what is said above with respect to the extrinsic evidence of the negotiations prior to the contract.

With respect to the evidence of the occurrences which arose subsequently to the execution of the contract, this only need be said: They are shown by the pleadings, as aforesaid, and as appears therefrom, they were not of such character as to make it appear that there is any ambiguity in the terms of the written contract.

I think, therefore, the court below should have sustained the exceptions to the answer and have construed the contract before referring the cause to the commissioner, so as to have given the commissioner and the parties the benefit of such decision, as the basis from which to determine the other issues in the cause, and thus avoid very great delay and needless expense to the parties in the introduction and consideration of a great mass of wholly irrelevant evidence. 2 Rob. (Old) Pr., p. 359; 2 Barton's Chy. Pr., sec. 189, pp. 679-680, citng a number of Virginia cases; 4 Minor's Inst., Pt. 2 (2d ed.), p. 1357, citing 2 Dan. Ch. Pr. 997, *Allen* v. *Smith*, 1 Leigh (28 Va.) 252, and *Corbin* v. *Mills' Ex'rs*, 19 Gratt. (60 Va.) 438.

The circumstance that the appellant in its pleadings asks for a reference upon other issues as to other

matters, and that the case is such that there will have to be a reference to the commissioner upon other issues, cannot, as it seems to me, justify, in the slightest degree, the action of the court in referring the cause to the commissioner to take and consider, and decide and report upon, irrelevant evidence, as aforesaid, with its needless consequences of delay and expense aforesaid. The decision and report of the commissioner upon such other matters could not be aided, and would certainly be needlessly complicated and delayed, by the reference in question.

In 2 Rob. (Old) Pr., p. 359, *supra*, this is said: "In Virginia nothing in chancery practice has been productive of so much mischief as orders of accounts unwisely made. Cases have frequently arisen in which if a particular point were determined in one way, an account would be proper; if determined the other way, an account would not be required. In such cases the court has often directed an account before it decided the point upon the decision of which the propriety of taking the account depends. After much time consumed and much money expended in obtaining the account, there would be a decree in the cause ascertaining that the account which had been ordered was wholly unnecessary. The Court of Appeals has discountenanced such a practice." Citing *Allen* v. *Smith*, 1 Leigh (28 Va.) 252.

To the same effect see the citations from 2 Barton's Chy. Pr. and 4 Minor's Inst., *supra*, citing numerous Virginia cases.

I think that this court can perform no more important duty and none which would strike a more effective blow at "the law's delays," nor one which would be more far reaching in its beneficial effect upon the vital need of a more speedy termination of litigation in

chancery cases, than to vitalize, as far as practical, the aforesaid long-standing condemnation of the practice mentioned; and, certainly in such a case as that before us, it should not, as I think, have our approval.

CAMPBELL, J., concurs in the dissenting opinion.