MEISSNER et al. v. OGDEN, L. & I. RY. CO et al.

No. 4049.   Decided Oct. 1, 1924.   On Application for Rehearing,
Feb. 10, 1925.   (233 Pac. 569.)

1. RAILROADS—SECURED BONDS EXCHANGED ON CONDITION NOT FUL-
FILLED, OUTSTANDING, RELATIVE TO DECLARING PRINCIPAL DUE FOR
DEFAULT IN INTEREST. Within provision of trust indenture se-
curing railroad bonds, for trustee declaring principal of se-
cured bonds due for default in interest on request of holders of
25 per cent. of the outstanding bonds, bonds never canceled or
surrendered, but merely exchanged for refunding bonds on con-
dition that the original bonds be held by the trustee for benefit
of exchanging owners, to preserve their prior lien, till all the
bonds were exchanged, which was never done, were outstand-
ing.

2. APPEAL AND ERROR—CONCLUSION AS TO RIGHT TO SUE NOT CHAL-
LENGED BY APPEAL OR CROSS-ASSIGNMENT NOT PRESENTED FOR RE-
VIEW. Conclusion of court that under trust indenture any mi-
nority bondholder had right to sue on his bond, or any interest
coupon, when it became due by its terms, not being challenged
by the appeal, nor cross-assigned as error, is not presented for
review.

3. RAILROADS—TRUST INDENTURE HELD NOT TO AUTHORIZE TWO-
THIRDS OF BONDHOLDERS TO WAIVE PAYMENT OF INTEREST COU-
PONS AT MATURITY. Provision of trust indenture, authorizing
two-thirds of bondholders to waive default and rights arising

(1)

by reason thereof, *held* not to authorize them to waive payment of interest coupons at maturity, and extend time of their payment, but only to waive power to declare principal due on account of default.

4. RAILROADS—POWER IN TRUST INDENTURE TO WAIVE DEFAULT DOES NOT AUTHORIZE WAIVER OF ANTICIPATED DEFAULT. Power given by trust indenture to two-thirds of bondholders to waive any default thereunder does not authorize waiver of anticipated default.

5. RAILROADS—POWER OF MAJORITY BONDHOLDERS TO WAIVE DEFAULT TO BE EXERCISED STRICTLY ACCORDING TO TERMS. Power under trust indenture of two-thirds of bondholders "by instrument in writing, signed by such holders," to waive default, and any rights arising by reason thereof, must be exercised strictly to be binding on other holders; so agreement of two-thirds, not purporting to be binding on others, and in terms merely for surrender of certain coupons and exchange of others for stock, was no such waiver of default.

6. RAILROADS—BONDHOLDERS HELD NOT ESTOPPED FROM RECOVERING ON INTEREST COUPONS BY DELAY AFTER AGREEMENT OF OTHER HOLDERS WITH COMPANY. Holders of railroad bonds *held*, especially in view of provision of trust indenture as to delay, not estopped to recover on interest coupons, by delay of over two years after agreement of other holders to surrender like coupons, if the company would use the funds for improvements, provided all holders would join in the agreement, though the nonagreeing holders knew company was using its funds for improvements.

7. RAILROADS—PROVISION OF TRUST INDENTURE AS TO SEPARATELY TRANSFERRED COUPONS HELD NOT TO AFFECT COMPANY'S LIABILITY TO PAY. Provision of trust indenture against coupons detached and transferred separately from bonds having any benefit under indenture till prior payment of principal of bonds and other coupons, *held* not to affect company's liability to pay them, but only holders' participation in security.

8. RAILROADS—COMPANY'S OPTION TO CONVERT NOTES INTO BONDS TERMINATES AT MATURITY OF NOTES. Option in notes to railroad company issuing them to convert them into its bonds terminates at maturity of the notes.[1]

---

[1] *Haskins* v. *Dern*, 19 Utah, 89, 56 P. 953.

See (1) 33 Cyc., p. 564 (1926 Anno); (2) 3 C. J., pp. 1339, 1404; (3) 33 Cyc., p. 547; (4) 33 Cyc., p. 566 (1926 Anno); (5) 33 Cyc.,

9. RAILROADS—ONLY PART OF TRUST INDENTURE MADE PART OF
TRUST AGREEMENT BY REFERENCE, THAT GOVERNING ISSUANCE OF
BONDS. Trust agreement executed by railroad company author-
izing issuance of notes, convertible at company's option into
bonds, to be issued under existing trust indenture, in addition
to those already issued under and secured by the indenture,
*held* by reference to make part of it only the applicable pro-
visions of the indenture governing the issuance of bonds, and
so not the provisions concerning defaults, waivers, remedies,
and inferior security for detached coupons.

10. RAILROADS—HOLDERS OF COMPANY'S CONVERTIBLE IMPROVEMENT
NOTES ISSUED UNDER TRUST AGREEMENT HELD, AS BETWEEN PAR-
TIES, TO HAVE LIEN OR MORTGAGE ON BONDS. Where by terms of
company's convertible improvement notes and of the trust
agreement pursuant to which they were issued, additional
bonds (of the amount of notes) which might be and were is-
sued under company's prior trust indenture, securing its bonds,
were constituted collateral security for payment of the notes,
*held* that though the elements of a complete pledge were lack-
ing, as between the parties, the holders of the notes had a lien
or mortgage on the bonds to secure payment of the notes.

11. RAILROADS—HOLDERS OF COMPANY'S CONVERTIBLE IMPROVEMENT
NOTES ENTITLED TO MAINTAIN ACTION TO ENFORCE PAYMENT.
Holders of company's convertible improvement notes, secured
as between the parties by lien or mortgage on additional bond
issued by company, pursuant to trust agreement, under trust
indenture, *held* on maturity of notes to have right to maintain
action to enforce their payments according to terms of contract.

12. RAILROADS—INDIVIDUAL BONDHOLDERS IN FORECLOSURE SUIT NOT
ENTITLED TO ATTORNEYS' FEES UNDER TRUST INDENTURE. Right
to attorneys' fees in foreclosure proceedings rests solely on
contract, so individual bondholders suing to enforce their bonds
under railroad company's trust indenture, which provides only
for paying attorneys' fee to trustee, are not entitled to such
fees.

On Application for Rehearing.

13. APPEAL AND ERROR—JUDGMENT—JUDGMENT WITHIN ISSUES AND
RELIEF PRAYED AND CONSISTENT WITH PURPOSE OF ACTION,

p. 566 (1926 Anno); (6) 33 Cyc., p. 547 (1926 Anno); (7) 33 Cyc.,
p. 546 (1926 Anno); (8) 33 Cyc., p. 553 (1926 Anno); (9) 33 Cyc.,
p. 493 (1926 Anno); (10) 33 Cyc., p. 458; (11) 33 Cyc., p. 557;
(12) 27 Cyc., p. 1781; 33 Cyc., p. 609; (13) 4 C. J. p. 1187; 33 C. J.,
p. 1148; (14) 33 Cyc., p. 553 (1926 Anno).

SHOULD HAVE BEEN GIVEN, AND ON APPEAL WILL BE DIRECTED, NOTWITHSTANDING PLAINTIFFS' ERRONEOUS CONTENTION. The action being in equity on bonds and notes and for foreclosure of liens securing them, and general relief being prayed, and the facts being fully disclosed by the pleadings and evidence, it was the duty of the court to dispose of the question and foreclosure bonds pledged by defendant railroad company's "trust agreement" to secure payment of the notes, this being within the issues and the relief prayed, and consistent with the purpose of the action, though plaintiffs erroneously contended the notes were secured by defendant's "trust indenture," and the court on appeal from judgment denying any foreclosure as to the notes, will direct such judgment, thus disposing of the whole case.

14. RAILROADS—NOTES NOT SHOWN CONVERTED INTO BONDS, UNDER COMPANY'S OPTION, BY MERE RESOLUTION. Railroad company's notes *held* not shown to have been converted by it into bonds secured by "trust indenture," as authorized by "trust agreement" under which the notes were issued, by company's mere resolution, it not appearing the things authorized by the resolution were performed prior to maturity of the notes, when the company's option ceased.

Appeal from District Court, Second District, Weber County; *M. C. Harris*, Judge.

Action by Fred Meissner and others against the Ogden, Logan & Idaho Railway Company and others. From a judgment granting partial relief only, plaintiffs appeal.

REVERSED AND REMANDED, with directions.

*King, Straup, Nibley & Leatherwood*, of Salt Lake City, for appellants.

*DeVine, Howell, Stine & Gwilliam*, of Ogden, for respondents.

CHERRY, J.

This is an action for the foreclosure of a "trust indenture" executed by the principal defendant to secure the payment

of bonds, a portion of which, together with certain "convertible improvement notes" subsequently executed, are owned by plaintiffs. From a judgment denying the main relief prayed for, and granting partial relief only, the plaintiffs have appealed.

The defendant Ogden, Logan & Idaho Railway Company was a corporation owning and operating a street railroad in Ogden City, and interurban railroad lines extending from Ogden City through the northern part of the state of Utah and into the state of Idaho. The name of the corporation was later changed to the Utah Idaho Central Railroad Company. For convenience it will be referred to as the Company. On January 2, 1915, it authorized an issue of first mortgage bonds of not to exceed $10,000,000, and executed a "trust indenture" to defendant Ogden Savings Bank as trustee, conveying its entire property as security for the payment of the bonds to be issued. $3,000,000 of the bonds authorized were at once issued and sold. Of this issue the plaintiffs purchased, and at the commencement of this action were the owners of bonds in the principal sum of $19,500.

The bonds were in denominations of $1,000 and $500 each, payable in 20 years after date, and bore interest at the rate of 6 per cent. per annum, payable semi-annually on the 2d days of January and July of each year, evidenced by interest coupon notes attached to the bonds. The issuance of bonds in addition to the $3,000,000 first issued, was authorized only upon condition that the net earnings of the Company should thereafter equal a certain specified amount, etc. Other particular provisions of the "trust indenture" will be referred to later.

On July 2, 1916, the Company executed to defendant Ogden Savings Bank, as trustee, an instrument called a "trust agreement." (It is important to observe the distinction between the "trust indenture" heretofore referred to, and which relates to the bonds, and the "trust agreement" now being described, and which relates to notes.) The "trust agreement" provided for the issuance of not to exceed $2,000,000, principal amount, of "convertible improvement

notes'' in denominations of $1,000 and $500 each, payable on or before January 2, 1921, with interest at the rate of 6 per cent, per annum, payable semi-annually on the 2d days of January and July of each year, evidenced by interest coupons attached to the notes. These notes were convertible, at the option of the maker, into its first mortgage bonds, issued or which might be issued under the provisions of the ''trust indenture'' for issuing bonds in addition to the $3,000,000 of bonds first issued, and the notes recited ''that said bonds are pledged under. the provisions of said trust agreement as collateral to secure the payment of the principal sum herein.'' And by a provision of the ''trust agreement'' the Company covenanted and agreed, for the benefit of the owners and holders of such notes as shall be issued, that the additional bonds which it might thereafter issue under the ''trust indenture'' should only be issued for the purpose of retiring and paying for the notes. Other particular provisions of the ''trust agreement'' will be referred to later.

Pursuant to the ''trust agreement,'' notes in the aggregate principal amount of $1,733,000 were issued and sold, of which the plaintiffs purchased, and at the commencement of this action were the owners of, notes in the principal sum of $29,500.

As before seen, the business of the Company was the operation of a street railroad in Ogden City, and interurban railroad lines from points in Utah, to points in Idaho. Part of its business was intrastate, and a part interstate. To accommodate itself in complying with the requirements of the Interstate Commerce Commission of the United States, and the public utilities commission of the state of Utah, its properties were segregated. A subsidiary corporation named the Utah Rapid Transit Company was organized under the laws of the state of Delaware, to which was conveyed the street railroad in Ogden City and certain other property in Weber county. The remaining railroad lines were retained by the original Company. At this time the fixed indebtedness of the latter amounted to the principal sum of $4,733,000 and consisted of the $3,000,000 of first mortgage bonds, se-

cured by the "trust indenture," and the $1,733,000 of convertible notes secured by the "trust agreement." This indebtedness was apportioned between the original Company and the subsidiary corporation, the Utah Rapid Transit Company, in the proportion of $3,733,000 to the former, and $1,000,000 to the latter. Refunding bonds for such amounts respectively, secured by trust deeds upon their respective properties, were duly authorized and issued by the two corporations, and offered to the holders of outstanding bonds and notes in exchange for the bonds and notes held by them. The proposal to exchange was upon the condition that the original bonds and notes surrendered should be held by the trustee for the benefit of the owners, and to preserve their prior lien by virtue thereof, until all of the outstanding bonds and notes had been surrendered and exchanged. Approximately 98 per cent. of the amount of the outstanding bonds and notes of the principal defendant was thus exchanged for the refunding bonds. The plaintiffs declined to make the exchange.

The interest coupons on the bonds and notes which became due on January 2, 1918, and semiannually thereafter until the commencement of this action, were not paid. The principal of the notes became due on January 2, 1921, at which time they had not been converted into bonds. On February 25, 1922, the plaintiffs commenced this action. It was alleged that the plaintiffs were the owners of more than 25 per cent. of the outstanding bonds and notes; that the trustee had refused upon the demand of plaintiffs to declare the principal of the bonds due by reason of the default in the payment of interest, and had refused to take any action or pursue any remedy to enforce the plaintiffs' rights; that the trustee had colluded and conspired with the defendants to coerce the plaintiffs into exchanging their bonds and notes for refunding bonds, etc. Plaintiffs prayed for a foreclosure of the "trust indenture," a sale of the property described therein, and the application of the proceeds to the payment of their bonds and notes, and for attorneys' fees, costs, and general relief.

The answer admitted the execution of the bonds and notes as alleged, but denied that plaintiffs were the owners of 25 per cent. of the outstanding bonds and notes, and denied the allegations of collusion, conspiracy, etc., alleged that the payment of the interest coupons maturing on January 2, 1918, to January 2, 1920, inclusive, had been waived by the requisite number of other bondholders, as authorized by the "trust indenture," and that certain other interest coupons were not enforceable because they had been detached and separately transferred from the bonds to which they belonged, after maturity; alleged a tender and brought into court what was charged to be the interest actually due and unpaid; alleged a timely offer to convert the notes into bonds, and tendered into court the appropriate bonds for the conversion of the notes held by plaintiffs.

The trial court found that plaintiffs did not own 25 per cent. in amount of the outstanding bonds and notes, and could not therefore declare the principal of the bonds due or recover the same; found against the plaintiffs on the question of collusion and conspiracy; found that the plaintiffs were required to accept bonds in conversion of their notes; and, with respect to the interest coupons in dispute, found that the payment of five of them had been waived, and others deferred because transferred separately from the bonds to which they belonged, and that the plaintiffs were entitled to a judgment for certain coupons maturing on and after July 1, 1920, the tender of which by defendants having been found insufficient. The decree required the plaintiffs to convert their notes into the bonds tendered by the Company, gave them judgment for the interest coupons found in their favor, with a conditional foreclosure, and denied the other relief prayed for.

Inasmuch as the rights and liabilities of the parties with respect to the bonds are materially different from their rights and liabilities with respect to the notes, it is necessary to consider them separately.

First as to the bonds: The plaintiffs asserted the right to declare the principal of the bonds due by reason of the

default in the payment of the interest.   Whether such right existed is dependent upon the contract.   The "trust indenture," which controls the matter, contains a provision that in case of such default—

"the trustee may, and upon the written request of the holders of 25 per cent. in amount of the bonds hereby secured and then outstanding, shall, by notice in writing, delivered to the Company, declare the principal of all the bonds hereby secured and then outstanding to be due and payable immediately; and upon such declaration the same shall become and be due and payable immediately, anything in this indenture, or in said bonds, to the contrary notwithstanding."

By the plain words of this provision, the right to declare the principal due on account of default in the payment of interest could only be exercised by the trustee on its own motion, or upon the demand of the owners of 25 per cent. in amount of the outstanding bonds.   The trustee did not exercise the right.   The plaintiffs claim to own 25 per cent. in amount of the outstanding bonds, upon the theory that the 98 per cent. of the original bonds which were exchanged for refunding bonds, as before stated, were retired, and were not thereafter outstanding.   This claim must fail for the reason that the exchange of original bonds for refunding bonds was made upon condition that the original bonds be held by the trustee for the benefit of the exchanging owners to preserve their prior lien until all outstanding bonds were exchanged; and they were so held by the trustee at the commencement of this action.   The bonds so deposited were not canceled or surrendered, but were outstanding as the obligations of the company.   The trial court properly found that the plaintiffs did not own 25 per cent. in amount of the outstanding bonds of the principal defendant Company.   The plaintiffs therefore had no right to declare the principal of the bonds due on account of default in the payment of interest.

With respect to the interest on the bonds, the case presents a different aspect.   The interest coupons sued upon were due, according to their own terms, when the action was commenced.   The trial court held that under certain provisions

of the "trust indenture," the payment of the five coupons maturing on January 2, 1918, and semiannually thereafter, to and including January 2, 1920, had been waived by other bondholders, and the time of payment postponed until the maturity of the bonds to which they were attached.

It is contended by defendants' counsel that the plaintiffs are precluded by certain provisions contained therein from bringing any action at all to foreclose the "trust indenture." The "trust indenture" contains a provision to the effect that no holder of a bond or coupon shall have the right to institute any action for foreclosure unless such holder, and also the holders of one-fourth in amount made written request upon the trustee to institute such action in its own name, and the trustee shall have refused, etc. A subsequent provision authorizes the holders of two-thirds in amount of outstanding bonds to waive any default or defaults under the provisions of the indenture, and any rights arising by reason thereof; "provided always that the obligation of the Company to pay the principal of said bonds at their maturity, with the interest thereon, shall continue unimpaired."

The trial court apparently concluded that the plaintiffs, even though holding less than 25 per cent. in amount of the outstanding bonds, had the right to sue upon interest coupons which had matured, because it awarded judgment to plaintiffs for certain interest coupons which matured on July 2, 1920, and thereafter. While the provisions of the "trust indenture" clearly preclude bondholders of less than 25 per cent. in amount of outstanding bonds from instituting any action on account of defaults occurring before the maturity of the bonds or interest coupons, the trial court proceeded upon the theory that any minority bondholder had the right to sue upon his bond, or upon any interest coupon, when the same became due according to its terms. This conclusion is not challenged by the appeal, nor is it cross-assigned as error by respondents. Hence it is not presented for review herein.

The plaintiffs were denied judgment for the five interest coupons maturing on January 2, 1918, and semiannually

thereafter to and including January 2, 1920, upon the grounds that the default arising from nonpayment had been waived by other bondholders, authorized so to do by the provisions of the "trust indenture," and upon the further grounds that plaintiffs were estopped from demanding payment of the interest coupons by reason of certain facts hereinafter set forth. The court expressly found that the interest coupons mentioned could not be recovered by the plaintiffs until January 2, 1935, the date of the maturity of the bonds to which the coupons were attached.

This finding is vigorously assailed by the plaintiffs upon the grounds that no such power on the part of other bondholders existed under the contract, and that if it did exist the evidence does not show it was exercised. This assignment presents two questions: (1) Does the "trust indenture" authorize two-thirds of the bondholders to waive the payment of interest coupons at maturity and extend the time of payment? and (2) was such authority exercised by the transactions had? Both questions must be answered in the negative. The provision of the "trust indenture," which is relied upon as authorizing the waiver, is as follows:

"The holders of two-thirds in amount of all bonds hereby secured for the time being outstanding, by an instrument or instruments in writing, signed by such holders, shall have power to waive any default or defaults under the provisions of this indenture, and any rights arising by reason thereof; provided, always, that the obligation of the Company to pay the principal of said bonds at their maturity, with the interest thereon, shall continue unimpaired; and provided, further, that no such waiver shall extend to or affect any subsequent default or impair any right consequent thereon."

The "trust indenture" contains numerous covenants to be performed by the Company relating to the payment of interest, taxes, and insurance, the protection and preservation of the property mortgaged, the management of its business, etc., and provides that in case of default, under certain conditions, the principal of the bonds may be declared due and payable, and the power of sale exercised by the trustee, or foreclosure had by legal action.

It is such defaults that the power to waive was given to

two-thirds of the bondholders. The express provision "that the obligation of the Company to pay the principal of said bonds at their maturity with the interest thereon, shall continue unimpaired," in view of the whole situation and circumstances, must be construed to mean the payment of the interest at its maturity as well as the principal when it becomes due. The power or right to declare the principal due on account of default in the payment of interest might be waived by the requisite number of bondholders, but the obligation to pay the interest at maturity, we think, was intended to "continue unimpaired."

The particular facts relied upon, as constituting a waiver of payment of the interest coupons in dispute are as follows: Bondholders, other than the plaintiffs, holding 98 per cent. in amount of the outstanding bonds, executed in writing an agreement to surrender to the Company for cancellation two interest coupons from each bond held by them, on condition that the money, which would otherwise have been used by the Company in payment of the interest coupons so surrendered should be used for the immediate purchase of freight equipment, and provided further that all bondholders join in the agreement. The same bondholders by a separate transaction exchanged and converted the remaining three of the interest coupons in dispute for shares of preferred and common stock of the Company. The latter transaction was evidenced by receipts in writing showing the receipt of the interest coupons by the Company and the receipt by the bondholders of the stock issued in exchange. The plaintiffs did not participate in these transactions. The trial court concluded that the donation of two interest coupons and the exchange of three others for corporate stock, by the other bondholders, amounted to a waiver of the payment of the interest coupons owned by the plaintiffs and postponed their maturity until the maturity of the principal of the bonds. This conclusion is erroneous and insupportable. The written instrument whereby the holders of 98 per cent. of the amount of outstanding bonds agreed conditionally to surrender for cancellation two interest coupons from each of their bonds,

did not purport to be a waiver of default or a postponement of the time of payment. If the agreement was executed, it only operated to extinguish and discharge the coupons surrendered. It did not purport to affect the rights of bondholders not participating in the transaction. It is not claimed that the plaintiffs were obliged to comply with the agreement and surrender their coupons for cancellation. Before the plaintiffs' rights can be affected by the action of other bondholders, it must appear clearly and satisfactorily that such action has been taken strictly according to the contract which authorizes it. The contract provides that the requisite bondholders "by an instrument or instruments in writing, signed by such holders, shall have power to waive any default or defaults under the provisions of this indenture, and any rights arising by reason thereof." The agreement relied upon did not deal with or refer to any default. Indeed, it does not appear that any default had occurred when the agreement was made, and an anticipated default could not be waived. *McClelland* v. *Norfolk So. R. Co.*, 110 N. Y. 469, 18 N. E. 237, 1 L. R. A. 299, 6 Am. St. Rep. 397.     **4, 5**

The legal effect of the agreement upon the rights of those who made it was the same as if their interest coupons had been paid in full in money. Manifestly, no such legal consequences could be involuntarily imposed upon the plaintiffs. As to the parties to the agreement, there was no waiver of default or extension of time of payment. The agreement did not purport to affect the rights of persons not parties to it; it did not mention the subject of waiving defaults; it was not, in terms or in fact, an agreement "to waive any default" or "any rights arising by reason thereof." It merely operated to discharge and extinguish the coupons surrendered, and had no legal effect upon the rights of others.

The acceptance by the majority bondholders of stock, in exchange for the other three of the interest coupons in question, was a transaction confined exclusively in its effect to parties participating. This agreement was not "by an instrument in writing," and did not purport to deal with the

subject of any default, or any rights arising by reason thereof. As in the case of the surrender of the other two interest coupons, the legal effect of the transaction was to extinguish and discharge the three interest coupons owned by the parties to the transaction, which were converted or exchanged, and the rights of the plaintiffs, who declined to make the exchange, were not affected by the transaction. Assuming the power to do so, no waiver of default was in fact made by the majority bondholders.

With respect to the estoppel: The trial court found that when the majority bondholders had elected to waive the default on account of the nonpayment of the interest coupons in dispute, the "Company accepted said waiver in good faith, and thereafter proceeded to expend any surplus earnings made in subsequent years in the betterment and improvement of its railroad properties and in the purchase of railroad rolling stock, with a view of enhancing its annual earnings and putting a greater property value under the liens of the trust indentures securing the first mortgage gold bonds of the Ogden, Logan & Idaho Railroad Company, and of the refunding bonds described in the answer of the defendants filed herein; that more than 2½ years have elapsed, and that the plaintiffs named in plaintiffs' complaint have had full knowledge during all of said time, and ample opportunity to avail themselves of the facts in respect to the Company's earnings and investments, and only after said earnings had been invested in the tracks and rolling stock now owned by the Company did the plaintiffs in this action protest, although they well knew at all times that the investments were being made by the said Utah, Idaho Central Railroad Company and that the investments so being made were adding to the security, which assured them of a full payment at maturity of the bonds held by them;" and concluded therefrom that the plaintiffs were estopped from recovering the interest coupons in question.

There is no evidence in the record to support the finding of facts made, and besides, the facts as found by the court are insufficient to create an estoppel against the plaintiffs. Especially is this true in view of a stipulation of the "trust indenture" which provides:

"No delay or omission of the trustee, or of any holders of the bonds hereby secured, to exercise any right or power accruing upon any default as aforesaid, shall impair any such right or power, or shall be construed to be a waiver of any such default or acquiescence therein."

The finding that the payment of the interest coupons mentioned was waived, and the time of their payment postponed, and that the plaintiffs are estopped from recovering the same, must be set aside.

The trial court denied recovery upon a number of interest coupons owned by one of the plaintiffs, which it found had been detached and transferred separately from the bonds and notes to which they belonged after the maturity of the coupons. The action of the court was based upon a provision of the "trust indenture" which is as follows:

"No coupons belonging to any bond hereby secured, which in any way, on or after maturity, shall have been transferred or pledged separate or apart from the bond to which it relates, or which shall in any manner have been kept alive after maturity by extension or by the purchase thereof on behalf of the Company, shall be entitled, in case of a default hereunder, to any benefit of or from this indenture, except after the prior payment in full of the principal of the bonds issued hereunder, and of all coupons and interest obligations not so transferred, pledged or kept alive."

This provision does not in any manner modify or qualify the obligation of the Company to pay such coupons. It only affects the right of the owner of such coupons, as between him and other bondholders, to participate in the security afforded by the "trust indenture," and his right in this respect is not destroyed, but is merely made inferior and subordinate to the rights of other owners whose coupons have not been so separated and detached. The separation of the coupons from the bonds was not grounds for denying all relief. The coupons in question were due and unpaid, and plaintiffs were entitled to a judgment for the amount due upon them, with appropriate directions in the decree providing for the application of the proceeds of the mortgaged property in accordance with the contract.

As to the convertible improvement notes: The decree required the plaintiffs to accept the tender of the Company

to convert the plaintiffs' notes into bonds issued under the "trust indenture." The contract, relating to the conversion of the notes into bonds, consisted of the following provision, contained in the notes, viz.:

"This note is subject to redemption at par and accrued interest at the option of the Ogden, Logan & Idaho Railway Company on January 2, 1917, or on any subsequent interest day on thirty (30) days' notice, as provided in said trust agreement, and may, at the option of the Ogden, Logan & Idaho Railway Company be converted into Ogden, Logan & Idaho Railway Company first mortgage gold bonds, issued or which may be issued under the provisions of section 4, and section 5, of article 1 of the trust indenture securing said gold bonds at the par value of said bonds, which said bonds are pledged under the provisions of said trust agreement, as collateral to secure the payment of the principal sum herein."

The court found in effect that the Company exercised its option to exchange bonds for the convertible improvement notes, and has "at all times been ready and willing to tender to each of the plaintiffs  *  *  *  in exchange for their convertible improvement notes, a like principal amount of the first mortgage gold bonds,  *  *  *  but that plaintiffs  *  *  *  have at all times refused and still continue to refuse to surrender the said convertible improvement notes, and to accept in exchange therefore the bonds" etc.

This finding has no support other than the tender of conversion made by the Company, long after the maturity of the notes and after the commencement of this action. There is no evidence that the Company sought to exercise its option to convert the notes into bonds, at or before the time of maturity of the notes. The provision in the notes relating to the option prescribes no limit of time in which the right may be exercised. The plaintiffs contend that the option could only be exercised at or before the maturity of the notes. To sustain the decree, it must be held that the option existed and could be exercised after maturity. By the terms of the notes the Company was obligated to pay the sums named on or before January 2, 1921, with the option to convert the notes into bonds. In substance, the Company had the election to pay the notes in money or in bonds, and its undertaking, in point of time, was to

pay in one way or the other on or before January 2, 1921. In *Haskins* v. *Dern*, 19 Utah, 89, 56 P. 953, Mr. Justice Miner of this court said:

"Where a debtor has the election to pay either money or property, if he fails to make tender at the time fixed for payment, he thereby loses his election, and the obligee has the right to demand the money."

In *Texas & Pac. Ry. Co.* v. *Marlor*, 123 U. S. 687, 8 S. Ct. 311, 31 L. Ed. 303, a railroad company issued bonds with interest at 7 per cent, payable annually, with the provision that:

"In case such net earnings shall not in any one year be sufficient to enable the Company to pay 7 per cent. interest on the outstanding bonds, then scrip may, at the option of the Company, be issued for the interest."

The interest for two succeeding years became due, and the Company neither paid it in money nor declared its intention to issue scrip therefor. In a suit by a bondholder, who refused to receive the scrip after maturity, to recover the interest in money, it was held:

"(1) If the Company did not pay the interest in money by the interest day, it was bound to exercise, by that day, its option to pay it in scrip, and, if it did not, it became liable to the bondholders to pay the interest in money; (2) no demand by a bondholder was necessary, in order to entitle him to the payment of the interest in money, on the failure of the Company so to exercise such option."

We think the rule thus laid down is applicable to the case at bar, and that the option to convert the notes into bonds terminated at the maturity of the notes. It follows that the trial court erroneously required the plaintiffs to accept the bonds tendered by the Company in exchange for their notes.

The interest coupons on the notes were disposed of by the trial court in the same manner as in the case of the interest coupons on the bonds. The payment of five of them was held to have been waived, and a number of others were held unenforceable in this action because they had been detached and transferred separately, after maturity, from the notes to which they belonged. The plaintiffs were denied judgment

on these coupons. For the reasons already stated in connection with the same disposition of the interest coupons on the bonds, and for additional reasons to be stated, the refusal to award judgment to the plaintiffs for the interest coupons on the notes, was erroneous.

The provisions of the "trust indenture" relating to waivers and to detached and separately transferred coupons, were not a part of the "trust agreement," and the notes and interest coupons thereto attached were not affected by such provisions. The rights of the parties with respect to the notes are dependent upon the terms of the notes themselves and upon the "trust agreement" which was executed in connection therewith.

Some confusion results from the fact that the plaintiffs sued upon the bonds and notes together, without separately stating a cause of action for each. No question of pleading on that account was raised by defendants and none is considered now, but it becomes necessary to point out that the issue of bonds under the "trust indenture," and the issue of notes under the "trust agreement," were separate transactions and substantially independent of each other. The bonds were secured by what is in effect a real estate mortgage. The notes were secured by certain bonds "pledged as collateral" etc. The "trust indenture" is an elaborate instrument covering 71, closely printed pages, and prescribes in great detail for the particular manner, form, time, purpose, and amount in which, and the conditions upon which, the bonds may be issued, and the procedure by which they may be certified, authenticated, and registered. The property of the Company is conveyed to the trustee as security for the payment of the bonds, and upon the trustee is imposed rights and duties with respect to the enforcement of the trust for the benefit of the bondholders. It contains numerous covenants to be performed by the Company with respect to the possession, use, preservation, and management of the mortgaged property, and the payment of taxes, liens and insurance thereon; provides what shall constitute defaults, how they may be declared and waived, and the consequences

thereof; limits the right to resort to legal remedies to the trustee, except in certain cases, and specifically defines numerous rights, duties, and liabilities of the Company, the trustee, and the bondholders.

The "trust agreement" is a much briefer and simpler instrument. By it no property or security is conveyed to the trustee. The trustee has no power or duty to act for or represent the holders of the notes. Its sole duty is to participate in the execution of the notes and authenticate them. So far as material here, the instrument merely authorizes the issuance of "convertible improvement notes," prescribes their form and the conditions upon which they may be issued, reserves the option to convert them into bonds as heretofore stated, and covenants that it will not issue additional bonds under the "trust indenture" except for the retirement and payment of the notes, and contains the following provision:

"All provisions relating to the manner of issuance, to registry and the manner of registry, to certification and the manner of certification contained in the trust indenture securing the Company's first mortgage gold bonds, in so far as the same are applicable, shall be and are hereby made a part of this agreement, for the purpose of governing the issuance of any of the notes authorized to be issued under the provisions of this agreement, provided, however, that the specific enumeration herein contained as to any clauses relating to procedure in said trust indenture shall not be construed as an exclusion of any not so named, and that all provisions of said trust indenture not inconsistent with the intent and purpose of this agreement shall and are hereby specifically made a part of this agreement for the purpose of governing the issuance of the notes authorized to be issued under the provisions of this agreement."

The determination of what portions of the "trust indenture" are thus by reference made a part of the "trust agreement" must depend upon the language of the reference, the contents of the instrument referred to, and the nature and circumstances of the transaction. The language employed plainly limits the reference to the provisions governing the issuance of the bonds, which are made a part of the "trust agreement" for "the purpose of governing the issuance of the notes." The "trust indenture," the instrument referred

to, contains provisions governing the issuance of bonds, grouped together in one article, and separate and distinct from other articles dealing with defaults, waivers, remedies, and other subjects. The article governing the issuance of the bonds does not refer to any subject of default, waiver, remedy, or penalty for detaching interest coupons after maturity.

There is nothing in the "trust agreement" or in the notes concerning any default or waiver, and no provision for declaring the principal of the notes due in case of nonpayment of interest or other default. The trustee of the "trust agreement" had no power or right or duty to pursue any remedy for or to represent the noteholders. Hence the provisions of the "trust indenture" relating to defaults, waivers, and remedies were wholly inapplicable to the "trust agreement." We conclude, therefore, that the only part of the "trust indenture," which was made a part of the "trust agreement" by the reference quoted, was the article containing the provisions governing the issuance of the bonds, the word issuance being used in a restricted sense, and that the provisions concerning defaults, waiver, remedies, and inferior security for detached coupons were not intended to be and were not thereby made a part of the "trust agreement." In the consideration of the plaintiffs' rights by virtue of their notes, there is therefore no question of waivers, or limitation of the right to sue, or of any depreciation of the security for any detached interest coupon.

As before stated, by the terms of the notes themselves and the provisions of the "trust agreement" executed in connection therewith, the additional bonds which might be issued under the "trust indenture," of equal principal amount with the notes, are constituted collateral security for the payment of the notes. Such additional bonds were in fact issued and were tendered (too late) in exchange for the plaintiffs' notes. While the elements of a complete pledge may be lacking, we think, as between the parties, the plaintiffs have a lien or mortgage upon such bonds to secure the payment of their notes. The notes having matured and being unpaid, the plaintiffs clearly have the right to main-

tain an action to enforce their payment in accordance with the terms of the contract.

In addition to the main relief prayed for, the plaintiffs prayed for a reasonable amount to be fixed and allowed as attorneys' fees for the services of their attorneys performed in this action. This was denied by the trial court. Plaintiffs assign error on this account, and insist that attorneys' fees should have been allowed. The right to attorneys' fees in foreclosure proceedings rests solely on contract, and no such allowance can be made in the absence of a contract or stipulation therefor. 27 Cyc. 1781. The only references to the subject of attorneys' fees found in the contract are the following provisions in the "trust indenture":

"The trustee may select and employ in and about the execution of this trust suitable agents and attorneys, whose reasonable compensation shall be paid to the trustee by the Company, or, in default of such payment, shall be a charge upon the mortgaged property and the proceeds thereof, paramount to said bonds. * * *"

"The trustee shall have a first lien upon the mortgaged property and funds for its reasonable expenses, counsel fees and compensation, and for all liabilities incurred in and about the execution of the trust hereby created, and the exercise and performance of its powers and duties hereunder, which expenses, counsel fees and compensation the Company covenants and agrees to pay on demand."

As hereinbefore stated, these provisions have no application to the notes, but relate exclusively to the bonds. The general stipulation to pay attorneys' fees upon suit or foreclosure, usually found in notes and mortgages, is not contained in any of the instruments sued upon in this action. The stipulations of the "trust indenture" above quoted, do not, in terms, bind the Company to pay attorneys' fees except to the trustee. We are not warranted in extending the contract beyond its plain terms. The plaintiffs are suing here in their own right. However desirable it might be to enable them to recover their debt without deduction for legal expenses, the contract does not, in our opinion, justify it. The trial court properly refused to award attorneys' fees to the plaintiffs. A number of other questions were argued in the briefs, some of which we deem

immaterial, and others not necessary to consider on account of the conclusions reached.

The decree of the trial court is reversed and the cause is remanded to the district court, with the following directions: To recast its findings and conclusions to conform to the views herein expressed, and to enter a judgment and decree in favor of the plaintiffs upon their bonds and the unpaid interest thereon as in cases where the debt secured is not all due, as indicated by Comp. Laws Utah 1917, § 7234. The payment of the unpaid interest coupons, which have matured, should be enforced by the sale of the mortgaged property, if necessary, without waiting for the maturity of the principal or other interest coupons. Appropriate provisions may be made for the application of the proceeds of the mortgaged property to the payment of the particular coupons detached and separately transferred, in accordance with the stipulations of the contract as hereinbefore construed. The plaintiffs to have a judgment and decree for the full amount of their notes, and the unpaid interest coupons, with interest after maturity until paid; a decree that they have a lien upon the corresponding principal amount of additional bonds issued under the ''trust indenture'' to secure the payment of the notes, together with a foreclosure and sale of the bonds, in the usual manner and as provided by law, with a provision for a deficiency judgment in case the proceeds of sale are insufficient, etc. Appellants to recover costs.

THURMAN and FRICK, JJ., and HANSON and WOOLLEY, District Judges, concur.

WEBER, C. J., being ill did not participate herein.

GIDEON, J., being disqualified did not participate herein.

On Application for Rehearing.

CHERRY, J. In a petition for rehearing respondents complain that by directing a judgment foreclosing the bonds

pledged to secure the payment of the "convertible improvement notes" this court departed from the issues as made by the pleadings and proceeded upon a theory not advanced or relied upon by the plaintiffs in the trial court.

This is an action in equity upon the bonds and notes owned by plaintiffs, and for the foreclosure of the liens securing the same. General relief is prayed for. The pleadings and the evidence fully disclose the facts relating to the execution of the bonds and notes, and the manner in which they were secured. There is no dispute in the evidence in this respect. It is true that the plaintiffs contended that the "notes" were secured by the "trust indenture," and that this court found to the contrary. But it appeared from the uncontradicted evidence that the "notes" were secured by bonds of an equal sum, and this court, with all the facts before it, directed a judgment for the foreclosure of the plaintiffs' lien upon the bonds. The judgment was within the issues as made by the facts pleaded, and the relief prayed for and was perfectly consistent with the purpose of the action. Under such circumstances, it was the plain duty of the court to dispose of the question. "A court of equity will not take two bites at a cherry." *Mathieson Alkali Work* v. *Virginia Banner Coal Cor.* (Va.) 124 S. E. 470. (The writer of this decision would be happy if the rule extended to counsel.)

A further complaint is made that the question of exercising the option to convert the notes into bonds was not presented by the pleadings, and that this court assumed, contrary to the fact, that there was no evidence that the company had exercised such option. This objection is utterly untenable. The matter was expressly pleaded, and a specific finding of fact was made thereon by the trial court. With respect to the evidence relating to exercising the option to convert the notes before their maturity, the only evidence offered was that the railroad company had passed a resolution authorizing the issuance of $1,000,000 in bonds to convert an equal amount of outstanding notes, and that, when issued, the bonds were to be delivered to the trus-

tee who was authorized and directed to call in the notes and make the conversion. But there was no evidence whatever that the acts authorized by the resolution were performed at any time prior to the maturity of the notes. The mere passing of the resolution, in the circumstances, was of no legal consequence, and of no value as evidence of an offer or tender of conversion.

Very bitter complaint is made that this court, in arriving at its conclusion with respect to the convertible improvement notes, without referring to the fact, reversed the former decision of this court in the case of *Barker* v. *Utah-Idaho Cent. R. R. Co.*, 57 Utah, 494, 195 P. 635. The only conflict between the instant case and the *Barker Case* is upon a question of fact. In the *Barker Case* the court determined a question of pleading according to a fact alleged in the answer. In the instant case the same question of fact arose, and this court upon the evidence found the fact the opposite way. There was no principle of law decided in the *Barker Case*, which conflicts with the decision in this case, and hence there was no necessity or even propriety in referring to the *Barker Case*.

The right of the plaintiffs to recover at all on the bonds, on account of the stipulation in the "trust indenture" limiting the right to sue to the trustee or to the holders of one-fourth in amount of outstanding bonds, is again argued, and it is claimed that such right does not exist. We find no sufficient reason for departing from the conclusion heretofore reached upon that question.

The petition for rehearing is denied.

THURMAN, J., and HANSON and WOOLLEY, District Judges, concur.

FRICK, J. Counsel for respondents, in their brief in support of their petition for rehearing have deemed it necessary to make special reference to myself in connection with my concurrence in the opinion filed in the case of *Barker* v. *Utah-Idaho Cent. R. R. Co.*, 57 Utah, 494, 195 P. 635. Ordi-

narily, I should not notice the matter, but, in view that the reference, to say the least, is disrespectful in both tone and spirit, I feel constrained to make a few remarks respecting the matter.

It goes without saying that counsel frequently use strong language in their arguments in support of their applications for rehearing. When such is the case it is usually attributed to their zeal for their clients' causes. Zeal, tempered with reason, is not only not to be condemned, but it should be commended. Intemperate language, however, whether in print or speech, is not to be commended. Neither does it add anything to the force of the argument, or to the suggestions of counsel to print the same in capital letters. Quite apart from the fact that to do so is in violation of the rules of this court, it is utterly without effect. Capital letters in printed argument have no greater effect than mere noise in oral argument. It may afford some relief to counsel, but it certainly adds nothing to the force of the argument. Nor does it aid the court in arriving at a just result. It is, however, boldly asserted that, in view of the result reached in the instant case, the *Barker Case,* has been overruled, and I am especially called on to defend my action in concurring in both opinions.

As a matter of course, I, and not counsel, must assume the consequences of an erroneous or wrong decision. Whether the result in a particular case, in view of the state of the record in that case, is in conflict with the result reached in another case involving the same legal question, but under a different state of the record, does not depend upon mere assertion. If everything that is boldly asserted by counsel in their applications for rehearing were by this court taken as conclusive, either as to the law or the facts, our decisions would soon become a mere jumble of contradictions. While errors of necessity occur in decisions rendered by men with fallible judgments, yet, when they do occur, they should be pointed out in respectful and temperate language and in a spirit of toleration.

There is, however, no merit to the contention that the

*Barker Case* has been overruled. In both the *Barker Case* and the instant case two kinds of obligations were involved (1) negotiable bonds secured by a trust deed, and (2) ''convertible improvement notes,'' which were convertible into bonds upon the conditions stated in the opinion in this case. If, therefore, in the *Barker Case,* either one or the other of the obligations just referred to were secured, the answer stated a good defense in a law action (and such was the action in the *Barker Case*), and the demurrer should have been overruled. In the *Barker Case* the only question before this court was whether the answer stated a defense. And that is practically what counsel in their brief filed in that case insisted upon. In that case the chief respondent in this case, after the demurrer was sustained, refused to appear further in the action. In view of that there was no trial upon the merits. For the reason, therefore, that the averments in the answer were admitted by the demurrer, this court held that the answer stated a defense, and that the demurrer was erroneously sustained. The judgment in favor of the plaintiff in that case was therefore reversed. The reversal was, however, and could only have been, based upon the erroneous ruling of the trial court in sustaining the demurrer. Nothing was therefore adjudicated in that case, except that the answer stated a good defense to an action at law. What became of that action I do not know. The action here is one in equity, in which it was sought to recover on both the bonds and the convertible improvement notes, and to subject the alleged security to the payment of the bonds and notes sued on. Many issues were presented in the present action, among which were waiver, estoppel, fraud on the part of the principal respondent and other issues. The trial court made findings upon those issues, some of which were in favor of one party, and some in favor of the other. An appeal was taken by the plaintiffs in this action, and the whole matter was presented to this court. As appears from the opinion, this court agreed with the trial court on some of its findings of fact and conclusions of law, and disagreed with it on others. It was held, how-

ever, that, in view that the improvement notes had not been converted into bonds, such notes were not covered by the trust deed. This conclusion was arrived at after a most thorough consideration of all of the terms and conditions contained in the written documents introduced in evidence, and in the light of the oral evidence produced at the trial. To have held that the issue decided in the *Barker Case* was determinative of all of the various issues presented in the instant case would have resulted in manifest injustice. It should require no great effort to demonstrate to any lawyer that a decision upon a demurrer to a pleading is not necessarily decisive upon the merits of the case.

While it is true that the opinion in the *Barker Case* may have contained some statement not necessary to the decision, yet, it is equally true that nothing was, or could properly have been decided in that case except that in view of the averments contained in the answer which were admitted by the demurrer, the answer necessarily stated a good defense. By that, however, this court did not hold that the respondents would necessarily establish as true all the averments in the answer. That we did so, it seems, is what counsel contend for in their petition for rehearing.

In view of all the facts and circumstances, therefore, it was not necessary to distinguish the decision in the *Barker Case* from the one in the instant case. Nor would it have been in the least "embarrassing" to have distinguished the *Barker Case* had it been necessary to do so. It is, however, somewhat embarrassing for me to be compelled to correct counsel's extravagant statements in their application for a rehearing. In this connection it is gratifying to me to be able to say that in my long service on this bench offenses of that nature have not been numerous, while the offenders have been less numerous still.

In my judgment, there is no merit to the petition for rehearing, and hence it should be denied.